JAMES R. SHEFFIELD, AND E. J. PARKS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. CONSOLIDATED FOODS CORPORATION, PURCESS, GRAHAM & CO., INC., AND HANES CORPORATION

No. 91

(Filed 7 April 1981)

**Corporations § 16.1— Tender Offer Disclosure Act — inapplicability to open market purchases of securities**

The North Carolina Tender Offer Disclosure Act, G.S. Ch. 78B, does not apply to open market acquisitions of securities aimed at gaining corporate control where the seller experiences no more than the normal market pressures to sell. Therefore, the Act did not apply to open market purchases of a corporation's stock where (1) there was no active and widespread solicitation of shareholders; (2) there was no premium offered over market price; (3) the purchaser's "offer" of terms was subject to the working of the normal market place; (4) there was no offer contingent on tender of a fixed number of shares; (5) there was no offer open for a limited period of time; (6) the shareholders were not subjected to pressure to sell their stock; and (7) there were no public announcements of a purchasing program preceding or accompanying the rapid accumulation of the corporation's stock.

Justice MEYER took no part in the consideration or decision of this case.

ON plaintiffs' petition for discretionary review, pursuant to G.S. 7A-31, prior to determination by the Court of Appeals, of entry of summary judgment in favor of defendants by *McConnell, Judge,* at the 7 February 1980 Session of Superior Court, GUILFORD County.

The issue on this appeal is whether the North Carolina Tender Offer Disclosure Act [hereinafter "Act"] is applicable to purchases of securities on the open market. Our opinion presents the first appellate court construction of the Act, enacted as Chapter 78B of our General Statutes by the 1977 Legislature.

This case was argued as No. 71 at the Fall Term 1980.

*Smith, Moore, Smith, Schell & Hunter, by McNeill Smith, Doris R. Bray and Thomas C. Watkins, for plaintiff-appellants.*

*Brooks, Pierce, McLendon, Humphrey and Leonard, by Hubert Humphrey and Jerry W. Amos, for defendant-appellees.*

CARLTON, Justice.

Plaintiffs filed a complaint alleging violation of the North Carolina Tender Offer Disclosure Act, Chapter 78B of the General

Statutes, by defendant Consolidated Foods Corporation, a Maryland corporation, in connection with its takeover of Hanes Corporation, formerly a North Carolina corporation.[1] The trial court allowed summary judgment for defendants. We hold that the Tender Offer Disclosure Act does not apply to purchases of stock on the open market and affirm.

## I.

A merger of Hansco, Inc., a wholly owned North Carolina subsidiary of Consolidated Foods Corporation, and Hanes Corporation was consummated on 1 July 1979. Hanes thereby became a wholly owned subsidiary of Consolidated and it, Hanes, ceased to exist as a separate entity. The tactics employed by Consolidated in purchasing the stock of Hanes gave rise to this lawsuit.

The pertinent facts are undisputed. For many years Hanes was a prominent, publicly held North Carolina corporation with several thousand shareholders. Its shares were listed on the New York Stock Exchange. From 2 June 1978 through 5 September 1978, Consolidated purchased, on the open market, an aggregate of 905,900 Hanes shares. The shares were purchased during this period at prices ranging from a high of about $50 to a low of about $35 per share, for a total of $41,478,033, including brokerge commissions. These purchases resulted in aggregate holdings by Consolidated of more than 20% of the Hanes stock then outstanding. Plaintiffs alleged that Consolidated's purchasing program was purposely carried out in a covert manner so as to enable Consolidated to keep its identity secret and its accumulation of Hanes shares unknown. Plaintiffs' complaint alleged that Consolidated actively concealed its purchases by using "blind" or "numbered accounts" with different brokerage firms. In answers to interrogatories, Consolidated stated that in purchasing Hanes shares it dealt with Morgan Stanley Company, a New York brokerage firm, but that "[i]t is understood that Morgan Stanley dealt with other brokerage firm or firms in executing such purchases . . . ." On or before 25 August 1978, Consolidated had acquired in aggregate more than 5% of all outstanding Hanes common stock.

---

[1] The parties have stipulated that this action was moot as to defendant Hanes Corporation by the time of the trial court ruling on summary judgment and that the action against defendant Purcell, Graham & Co. was dismissed without prejudice. This appeal therefore involves only defendant Consolidated Foods Corporation.

Sheffield v. Consolidated Foods

On 1 September 1978, Hanes instituted a separate action in the United States District Court for the Middle District of North Carolina. Hanes alleged, *inter alia*, that the purchases constituted illegal market manipulation in violation of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78 a-kk, and violated the North Carolina Tender Offer Disclosure Act because no disclosure statement had been filed. The named defendants were Purcell, Graham & Co., a New York brokerage firm which had made a large purchase of Hanes stock, and Doe Corporation. At that time, Consolidated's identity was still unknown.

On 5 September 1978, the New York Stock Exchange suspended trading of Hanes stock and the suspension was continued the following day.

On 7 September 1978, an action was filed pursuant to the Act against Consolidated in Superior Court, Wake County, by the Attorney General of North Carolina on behalf of the Secretary of State of North Carolina, the administrator of the Act. Consolidated's identity had become known by this time by virtue of its filing, on 5 September 1978, of a disclosure document pursuant to a provision of the Securities Exchange Act of 1934 which requires such disclosure within ten days *after* an offeror has accumulated 5% of a target corporation's stock. 15 U.S.C. § 78m(d)(1)(Supp. 1979). Judge Bailey issued a temporary restraining order enjoining Consolidated from purchasing additional shares of Hanes. The order was continued by Judge Godwin for an additional ten days on 12 September 1978.

On 8 September 1978, officers of Hanes and Consolidated met and began negotiations which, on the evening of 13 September 1978, resulted in an agreement in principle for the merger. This agreement was publicly announced on 14 September 1978.

On 15 September 1978, the board of directors of Hanes approved the merger agreement in principle and an agreement was reached by Consolidated, the Secretary of State and the Attorney General relating to the State's pending action. The settlement agreement provided the action would be dismissed provided details of the merger were to the satisfaction of the officers and directors of Hanes and that Consolidated file the disclosure statement required by the North Carolina Act. The statement was filed on 22 September 1978, the temporary restraining order was dissolved, and

Sheffield v. Consolidated Foods

the Secretary of State dismissed his action against Consolidated.

The merger agreement was executed on 22 September 1978. It provided that all remaining Hanes shareholders at the time of the merger would receive $61.00 per share for the Hanes stock then outstanding.

On 11 October 1978 Hanes took a dismissal with prejudice of its action against Consolidated in the federal court and Consolidated took a dismissal of a counterclaim.

The merger agreement led to stock purchase agreements between Consolidated and members of the Hanes family who owned a major portion of Hanes stock. The agreements provided for the purchase by Consolidated of 1,019,734 Hanes shares, some 23.7% of the Hanes shares then outstanding, at $61.00 per share. Then, on 15 November 1978, Consolidated announced its willingness to purchase any and all Hanes shares at $61.00 per share. A total of 1,320,670 Hanes shares, some 30.7% of the Hanes stock then outstanding, were purchased by Consolidated pursuant to this offer.

A meeting of Hanes shareholders was called to consider the merger on 29 January 1979. By this time, Consolidated owned approximately 75.4% of the Hanes stock. The merger was consummated.

Plaintiffs purport to bring this action on behalf of all persons who sold Hanes shares during the period of time Consolidated was allegedly in violation of the North Carolina Act.[2] Plaintiffs initially

---

[2] Plaintiff Sheffield alleged that in August of 1978 he was the owner of 6,000 shares of Hanes common stock; that in August of 1978 neither he nor his attorney in fact had knowledge of any negotiations between Hanes and Consolidated; that he had no knowledge of the purchases by Consolidated and its brokers of Hanes stock or Consolidated's plan to acquire control of Hanes; that had Consolidated complied with the North Carolina Act, the Secretary of State would have been notified and certain information with respect to the tender offer would have been filed with the Secretary and Hanes; that this filing would have been made at least by 26 July 1978 (30 days prior to 25 August 1978, the date that Consolidated acquired in excess of 5% of the outstanding common stock of Hanes) and Consolidated and its brokers would have made no further purchases for the 30-day period following the filing during which time he and other Hanes shareholders would have had a chance to decide whether to sell on the basis of the disclosed information; that instead, however, defendants did not obey the statute and the 6,000 shares owned by plaintiff Sheffield were sold without the benefit of its protection; that the shares were sold in three 2,000 share transactions on August 25, August 30 and August 31 at prices of $41.25, $49.00 and

Sheffield v. Consolidated Foods

sought to exercise a statutory right to rescind the sales of Hanes shares and to recover the shares under G.S. 78B-6.[3]

A temporary restraining order preserving their right to do so was entered by Judge Walker simultaneously with the filing of plaintiff's complaint. This order was dissolved on 28 January 1979 based on a finding by Judge Walker that Consolidated was able to respond to any damage award in favor of plaintiffs. Since the merger was

---

$50.00 per share, respectively, for each of the three 2,000 share sales.

Plaintiff Parks alleged that in August of 1978 he was the owner of 986 shares of Hanes common stock; that he had no knowledge of any negotiations between Consolidated and its brokers concerning Hanes stock or Consolidated's plans to acquire control of Hanes; that he sold his 986 shares without the benefit of protection afforded by the Act and that due to violations of the Act as set forth in the complaint, Parks sold 86 of his shares at a price of $49.50 per share and his remaining 900 shares at a price of $49.5/8 per share on 31 August 1978.

We express no opinion on whether this suit is properly denominated a class action.

[3] That statute provides:
   (a) An offeror who
      (1) Makes a tender offer that does not comply in all material respects with the provisions of G.S. 78B-3, or
      (2) Makes a tender offer without complying in all material respects with the provisions of G.S. 78B-4, or
      (3) Makes a tender offer by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading (the offeree not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and did not act in reckless disregard, of such untruth or omission, shall be liable to any offeree whose equity securities are sold
to the offeror pursuant to the tender offer and such offeree in a civil action shall be entitled (i) to recover such equity securities, together with all dividends, interest or other payments received thereon upon the tender of the consideration received for such securities from the offeror, or (ii) if the offeror has transferred such equity securities to a third party, to recover such damages as the offeree shall have sustained as the proximate result of the conduct of the offeror which is in violation of this section.

   (b) No civil action may be maintained under this section unless commenced before the expiration of two years after the act or transaction constituting the violation.

   (c) The rights and remedies of this Chapter are in addition to any other rights or remedies that may exist at law or in equity.

G.S. § 78B-6 (Cum. Supp. 1979)

consummated and all Hanes shares were cancelled by operation of law, plaintiffs' present claim is for money damages, not rescission. The amount of damages sought is the difference between the price per share received by plaintiffs for their sale of Hanes shares and the $61.00 per share received by the Hanes family and others. G.S. § 78B-6(a)(3)(ii)(Cum. Supp. 1979).

We now consider the propriety of the entry of summary judgment in favor of defendants. The specific issue with which we are confronted on this appeal is whether the North Carolina Tender Offer Disclosure Act applies to open market acquisitions aimed at gaining control in which the seller experiences no more than the normal market pressures to sell.

## II.

The North Carolina Act was passed in an attempt to supplement the federal regulation of tender offers and to remedy the perceived inadequacies in that legislation. In order to divine the intent of our Legislature in adopting the Act, it is necessary to examine the history behind the federal legislation, the Williams Act, Securities Exchange Act of 1934 §§ 13(d)-13(f), 14(d)-14(f), 15 U.S.C. §§ 78m(d)-78m(f), 78n(d)-78n(f) (1976 & Supp. 1979), and to examine the operation of the Williams Act itself.

The use of tender offers as a means to gain control of a corporation was virtually unregulated until passage of the Williams Act in 1968. Note, Cash Tender Offers, 83 Harv. L. Rev. 377, 377, 379 (1969). Regulation was absent because it was not until the 1960s that the tender offer came into vogue as a takeover weapon. *See* Fleischer & Mundheim, *Corporate Acquisition by Tender Offer*, 115 U. Pa. L. Rev. 317 (1967).

Focus by the legal and business communities, and eventually the government, on tender offers as a means to acquire control of large corporations resulted from what has been called the "conglomerate merger mania of the early and mid 1960s." E. Aranow & H. Einhorn, *Tender Offers for Corporate Control* 64 (1973). Although tender offers have traditionally been employed by corporations wishing to repurchase their own securities, Zilber, *Corporate Tender Offers for Their Own Stock: Some Legal and Financial Considerations*, 33 U. Cin. L. Rev. 315, 315 (1964); Note, The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv. L. Rev. 1250, 1253 (1973), it was not until this

period that tender offers came into widespread use as a method for corporate takeover; *see* Fleischer & Mundheim, *supra*, 115 U. Pa. L. Rev. 317. Prior to this time takeovers resulted almost exclusively from the traditional devices of mergers, consolidations and asset acquisitions. *See generally* Darrell, *The Use of Reorganization Techniques in Corporate Acquisitions*, 70 Harv. L. Rev. 1183 (1957). Because tender offers, unlike the more conventional means for gaining control, were unregulated, the tender offer became the fastest method of acquiring control of corporations and was found to be an attractive alternative to the more regulated processes of statutory merger and proxy contests. Note, *supra*, 83 Harv. L. Rev. at 378-79. The cash tender offer technique became the cheapest, simplest and quickest method of gaining corporate control. Aranow & Einhorn, *supra* at 64-66. It also offered to the offeror the benefits of secrecy and surprise. Cohen, *A Note on Takeover Bids and Corporate Purchases of Stock*, 22 Bus. Law. 149, 150 (1966); Note, *supra*, 86 Harv. L. Rev. at 1253-54. The tender offer's obvious great advantage to a raiding corporation was its ability to bypass strong and often hostile incumbent management by taking the offer directly to shareholders. *See* Fleischer & Mundheim, *supra*, 115 U. Pa. L. Rev. at 321. Economic conditions in the mid-1960s such as increased corporate liquidity, readily available credit, greater knowledge and sophistication of tender techniques, and the psychological appeal of straight dollars and cents language to normally apathetic shareholders gave impetus to corporate conglomeration. Once a raiding corporation selected its target, hostile battles for control between the respective management teams resulted, and the resulting confusion caused great concern among corporate executives, staff members of the Securities and Exchange Commission, the New York Stock Exchange and members of Congress. *See generally* Cohen, *Tender Offers and Takeover Bids*, 23 Bus. Law. 611 (1968).

The reasons for the concern over the widespread use of the tender offer technique were several. Most obvious was that when the raiding corporation's identity was concealed, the target company was powerless to present convincing reasons to shareholders for not selling securities at prices considerably higher than market prices. Hayes & Taussig, *Tactics of Cash Takeover Bids*, 45 Harv. Bus. Rev., March-April 1967, 135, 136-37. The technique also caused shareholders to be pressured into making hurried judgments because of the time limitations of the offer. *See* Cohen, *supra*, 22 Bus. Law. at 153-54. In spite of these and other risks to shareholders,

attempts to bring such tender offers under existing security laws were unsuccessful and, ultimately, the cash tender offer became the most successful and popular means of acquiring control over corporations. *See* Hayes & Taussig, *supra,* 45 Harv. Bus. Rev., March-April 1967, at 136. These unregulated transfers of corporate control came under serious scrutiny and provided the major impetus for passage of the Williams Act in 1968. *See* Note, *supra,* 86 Harv. L. Rev. at 1254.

## III.

In response to the problems described above, Congress, in 1968, enacted the Williams Act, 15 U.S.C. §§ 78m(d)-78m(f), 78n(d)-78n(f) (1976 & Supp. 1979) [hereinafter cited as "Williams Act"], as amendments to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78kk (1976 & Supps. 1977, 1978, 1979) [hereinafter cited as "Exchange Act"].

The key disclosure provision of the Williams Act with respect to tender offers — a term nowhere defined by the Act — is codified in Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d)(1976). Section 14(d) requires a tender offeror, *simultaneously* with the making of the tender offer, to disclose certain information to the Securities and Exchange Commission [hereinafter referred to as "SEC"] if the successful consummation of the offer would result in ownership of more than 5% of any class of the target company's equity securities. The pertinent portion of the amendment provides:

> It shall be unlawful for any person . . . to make a tender offer for, or a request or invitation for tenders of, any class of any equity security . . . if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 percentum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in Section 78m(d) of this title . . . .

Exchange Act § 14(d)(1), 15 U.S.C. § 78n(d)(1)(1976).

Any person to whom the above provision applies is required to file a statement with the SEC disclosing, *inter alia,* his identity and background, the source and amount of funds or other consideration

to be used for purchases, the number of shares he holds in the target company, any arrangements made involving the target company's stock, and any major changes contemplated in the company's corporate structure if control of the target company is desired. *Id.* In addition to this statement, the offeror is required to file with the SEC copies of all materials used to solicit shares in the target company and to furnish the target company with a copy of all filed information not later than the date such material is communicated to the security holders. *Id.*

Other provisions of the Williams Act go beyond requiring disclosure by the offeror. These provisions regulate the manner in which tender offers may be carried out. For example, shareholders who deposit their securities pursuant to a tender offer are given the right to withdraw their shares during the first seven days of the tender offer and at any time after sixty days from the date of the original tender offer if the offeror has not already purchased the tendered shares. Exchange Act § 14(d)(5), 15 U.S.C. § 78n(d)(5) (1976). Also, if the tender offer is for less than all of the target's outstanding shares and more than the requested number of shares are tendered within the first ten days of the offer, all shares tendered during that period must be purchased *pro rata*, as opposed to on a first come, first served basis. Exchange Act § 14(d)(6), 15 U.S.C. § 78n(d)(6)(1976). Moreover, the Williams Act provides that if, during the course of the tender offer, the amount paid for the target shares is increased, all tendering shareholders must receive the increased price even if they tendered their shares before the price increase was announced. Exchange Act § 14(d)(7), 15 U.S.C. § 78n(d)(7)(1976).[4] Finally, the Williams Act contains an anti-fraud provision designed to prevent false and misleading statements and fraudulent or manipulative practices in connection with a tender offer subject to its provisions. Exchange Act § 14(e), 15 U.S.C. § 78n(e)(1976).[5]

---

[4] The SEC has more recently promulgated a rule requiring tender offers to remain open for at least twenty days in an effort to discourage potential raiders from attempting a quick takeover, normally referred to as a "Saturday Night Special" or "blitzkrieg." Securities and Exchange Comm. Regulation 14E-1, 17 C.F.R. § 240.14e-1 (1980).

[5] Not discussed above are certain new rules and regulations issued by the Securities and Exchange Commission effective 7 January 1980 modifying the operation of some of the substantive provisions. The discussion above, unless otherwise

In addition to the regulation of classic tender offers under § 14(d) of the Exchange Act described above, Secton 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(Supp. 1979), contains provisions applying to acquisitions of securities *by any other means*. This section requires, *inter alia*, that within 10 days *after* an acquisition by any means other than a tender offer of more than 5% of the stock of a registered company, the acquiring person must file a disclosure statement with the Securities and Exchange Commission and send a copy of the statement to the issuer of the securities purchased. Under this section, the offeror-purchaser may continue purchasing without restriction during the ten-day period *after* he reaches the 5% level and *before* he files the required disclosure statement.

IV.

Seemingly in response to the failure of the Williams Act to require *advance* disclosure of proposed stock accumulations, the North Carolina Legislature enacted the North Carolina Tender Offer Disclosure Act [hereinafter "Act"] in 1977 as Chapter 78B of our General Statutes. In enacting the Act, North Carolina joined a majority of the states in providing supplemental legislation in the securities field. State legislation in this area has not, however, met with the approval of federal authorities responsible for enforcement of the Williams Act. The position of the Securities and Exchange Commission is that "the method of regulating tender offers which has been adopted by most of the states interferes with and often frustrates the operation of the Williams Act." Securities and Exchange Commission, *Report on Tender Offer Laws* 13 (1980). As a result, the Commission has filed *amicus curiae* briefs on numerous occasions alleging that particular state laws are unconstitutional. See, *e.g., Great Western United Corp. v. Kidwell*, 577 F. 2d 1256 (5th Cir. 1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L. Ed. 2d 464 (1979).[6]

The North Carolina Act specifically provides for *advance* disclosure for all tender offers. G.S. 78B-4(a)(Cum. Supp. 1979) provides:

---

noted, relates to the applicable provisions of the Williams Act at the time of Consolidated's purchases of Hanes shares.

[6] The Commission has taken a similar position with respect to the North Carolina Act in another action presently pending before this Court, *Eure and Huyck Corp. v. NVF Company*, docketed as No. 92, Spring Term 1981.

No offeror shall make a tender offer unless at least 30 days prior thereto he shall file with the Administrator and deliver to the principal office of the subject company personally or by registered United States mail a statement containing all the information required by subsection (d) of this section.

Unlike its federal counterpart, the North Carolina Act does define a "tender offer." Indeed, it is the interpretation of the meaning of that definition which gives rise to this litigation. Under the North Carolina Act, a tender offer is:

an offer to purchase or invitation to tender, other than an exempt offer, made by an offeror, directly or indirectly, for such amount of any class of equity securities of a subject company that, together with equity securities of such class owned beneficially or of record by the offeror and his associates at the time of the offer or invitation, will in the aggregate exceed five percent (5%) of the outstanding equity securities of such class. A tender offer is "made" when the offer or invitation is first published or sent or given to the offerees.

G.S. § 78B-2(14)(Cum. Supp. 1979).

The term "subject company" is defined as a "corporation or other issuer of securities whose equity securities are the subject of a tender offer" and which is organized under the laws of and doing business in North Carolina or which has its principal place of business and substantial assets in North Carolina. G.S. § 78B-2(12) (Cum. Supp. 1979). The "administrator" of the Act is the Secretary of State. G.S. § 78B-2(1)(Cum. Sup. 1979).

With respect to the advance disclosure requirement, G.S. 78B-4 is the controlling statute. This statute provides in essence that a tender offer subject to the Act's provisions cannot be made unless at least thirty days prior to the date on which the offer is to be made, the offeror has filed with the Secretary of State and delivered to the principal office of the target company a disclosure statement. G.S. § 78B-4(a). This statement must contain substantially the same information as the offeror would be required to disclose at a later time pursuant to the Williams Act. G.S. § 78B-4(b)(Cum. Supp. 1979). Moreover, concurrently with the filing of the required disclosure statement under the North Carolina Act, the offeror must give

notice, either in the form of a reasonably disseminated news release or written communication to the target shareholders, of the following: that a tender offer is proposed to be made and that the disclosure required has been filed with the Secretary of State and delivered to the subject company, the amount of securities to be covered by the proposed tender offer and the date on which the offer is expected to be made, the consideration proposed to be offered, the identity of the offeror, and the purpose of the offer. G.S. § 78B-4(g) (Cum. Supp. 1979).

While the disclosure provisions discussed above are, in most instances, essentially similar to those required by the federal legislation, other provisions of the North Carolina Act are strikingly dissimilar. There are several outright conflicts. The North Carolina Act requires the concurrent filing of the disclosure statement with the Secretary of State, delivery of that statement to the subject corporation, and reasonable dissemination of notice to the equity security holders at least thirty days *prior to* the making of the tender offer. Neither the Williams Act nor the regulations promulgated by the SEC require such an advance notice provision. "Indeed, Congress specifically spurned proposals that a five day advance notice period be incorporated into the Williams Act, and in 1975 rejected amendments suggesting from thirty to sixty day prior notice rules." Comment, The North Carolina Tender Offer Disclosure Act: Congenitally Defective?, 14 Wake Forest L. Rev. 1035, 1043 (1978). Also, the North Carolina Act requires a ten-day waiting period after each amendment to the disclosure statement and a six-day wait after each revision of the offer before the tender offer may be operative. G.S. § 78B-4(e), 4(f)(Cum. Supp. 1979). No similar provision is contained in the Williams Act. Further, the North Carolina Act requires that each tender offer be effective, and presumably irrevocable, for at least twenty-one days, G.S. § 78B-3(1) (Cum. Supp. 1979), while the Williams Act implicitly requires only a ten-day life for the offer. Exchange Act § 14(d)(6), 15 U.S.C. § 78n(d)(6). G.S. 78B-3(1) allows an offeree to withdraw any securities tendered at any time up to three business days before termination of the offer or to withdraw unpurchased securities at any time after sixty days from the date of the initial offer, while Section 14(d)(5) of the Exchange Act, 15 U.S.C. § 78n(d)(5), provides similar withdrawal rights, but only during the seven business days succeeding the offer date or after sixty days from the offer date. Finally, G.S. 78B-3(2)(Cum. Supp. 1979) provides that when an

offer is made for only a portion of the outstanding equity securities of a certain class and more than that number are tendered, the offeror must purchase *pro rata* from each offeree as nearly as possible. The Williams Act counterpart prescribes for a proration of only those shares tendered during the first ten days of the offer. Exchange Act § 14(d)(6), 15 U.S.C. § 78n(d)(6). An additional provision of the North Carolina Act requires that all selling shareholders receive any increase in the consideration offered during the entire effective period of the tender offer even if they sold their shares before the increase in consideration was offered. G.S. § 78B-3(3) (Cum. Sup. 1979).

The North Carolina Act also provides for a right of private civil action for injured parties, injunctive relief by petition of the State, offeror or subject corporation, and criminal penalties. G.S. § 78B-6, -7, -8(Cum. Supp. 1979). An offeror who makes an offer subject to the provisions of the Act and who fails to comply with its filing and disclosure provisions is liable to any offeree whose equity securities are sold to the offeror for the securities themselves or for such damages as the offeree shall have sustained as the proximate result of the conduct of the offeror in violation of the Act. G.S. § 78B-6(a)(3).

In comparing the Williams Act to the North Carolina Act and other state acts, one commentator has noted:

[S]ince the Williams Act does not require any advance disclosure of either a "creeping" or a "classic" tender offer, it does not adequately protect either management or the shareholders against surprise or blitz tender offers which have come to be known as "Saturday night specials." Such tactics may deprive management of an opportunity to respond intelligently to the offer, may discourage or prevent competing offers, and may rush the shareholders into making unwise decisions. The state statutes are all intended to correct these perceived deficiencies in the federal law. They do so in a variety of ways, ranging from the highly protective and regulatory, such as in Pennsylvania, to the mildest and least burdensome form of advance notification, such as in Delaware.

The statute that was finally enacted in North Carolina is a compromise between two separate bills that reflected

these different points of view. One was quite protective, regulatory and burdensome for offerors; the other was very much less so. The resulting compromise was intended to strike the best balance between, on the one hand, the need to give management and the shareholders of the target company adequate information and time to evaluate and respond, and, on the other hand, the need to avoid discouraging either initial or competing tender offers that may be beneficial to the target company and its shareholders.

R. Robinson, *North Carolina Corporation Law and Practice* § 7-12 (2d ed. Supp. 1980)(footnotes omitted).

## V.

Plaintiffs vigorously contend (1) that the North Carolina Act expressly covers open market purchases such as those made by Consolidated from plaintiffs, (2) that under the proper construction of the Act, Consolidated was *required* to make a conventional tender offer for Hanes shares so that all Hanes shareholders would have been afforded the substantive protections of G.S. 78B-3, and (3) that under any construction of the Act, Consolidated should have filed the disclosure statement required by G.S. 78B-4. We must reject plaintiffs' contentions and affirm the trial court.

## A.

We first turn our attention to the meaning of "tender offer." Courts and other authorities agree generally that:

A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price. Cash or other securities may be offered to the shareholders as consideration; in either case, the consideration specified usually represents a premium over the current market price of the securities sought. This opportunity to tender shares at a premium remains open for only a limited period of time, often about two weeks.

A distinctive aspect of the conventional tender offer is that offerors typically condition their obligation to purchase on the aggregate tender of a stated number of

Sheffield v. Consolidated Foods

shares. If fewer than the stated number are tendered, the offeror need not purchase any shares. If more than the stated number are tendered, the offeror is not required to purchase the excess. Meanwhile, during the period in which the overall response is being determined, the shareholder relinquishes control over his tendered shares; they are placed with a depositary, the shareholder having only limited access to them. The position of a shareholder in a conventional tender offer is thus in sharp contrast with his position in ordinary market and negotiated transactions, where sellers retain control over their securities until a sale is completed.

Note, *supra*, 86 Harv. L. Rev. at 1251-52 (footnotes omitted); *see Smallwood v. Pearl Brewing Co.*, 489 F. 2d 579, 597 n. 22 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S. Ct. 134, 42 L. Ed. 2d 113 (1974).

The definition stated above is one which has been evolved by the courts over the years, for the term "tender offer" is nowhere specifically defined in the Williams Act. Obviously, the activities of Consolidated in purchasing the shares of Hanes do not fall within the generally accepted definition of a conventional tender offer quoted above. Indeed, plaintiffs do not so contend. Plaintiffs correctly note, however, that the North Carolina Act does define a "tender offer" and contend that Consolidated's activities here fall squarely within that definition.

Under the definitional statute, tender offer covers "an offer to purchase *or* invitation to tender." G.S. § 78B-2(14) (emphasis added). Pointing to the disjunctive "or," plaintiffs contend that our statutory definition of tender offer specifically encompasses two different types of transactions: (1) an "offer to purchase" the requisite amount of securities and (2) an "invitation to tender" such amount. According to plaintiffs' interpretation, the "invitation to tender" component of the definition, by use of the particularized term "tender," brings the conventional form of tender offer within the coverage of the Act, and the party making such a conventional tender offer would be subject to the requirements of our Act as well as the requirements of the federal legislation. On the other hand, plaintiffs argue, the "offer to purchase" component of the statutory definition under the state Act indicates a legislative intent to apply the Act to regulate acquisitions by means other than conventional tender offers. Plaintiffs contend that our Legislature elected to

cover *all offers* to purchase the requisite amount of security and, consequently, open market purchases such as those utilized in the instant case are also subject to the Act. Plaintiffs correctly note that "[c]oncentrated open-market accumulations can have an impact on shareholders just as significant as a conventional tender offer . . .," Knapp, *The Open Market Purchase Problem*, 32 Bus. Law. 1453, 1453 (1977), and contend that the North Carolina legislation was specifically enacted to cover such accumulations and any other types of offers for stock purchase otherwise qualifying under the Act.

That the North Carolina Act was not intended to embrace the open market transaction situation is indicated in the definitional statute itself. The last sentence of G.S. 78B-2(14) provides, "A tender offer is 'made' when the offer or invitation is first published or sent or given to the offerees." Plainly, therefore, there is no "tender offer" under the North Carolina Act until an offer or invitation to purchase *is communicated to shareholders.* Those even casually acquainted with the operation of major stock exchanges or over the counter marketing arrangements are aware that open market transactions involve no such offer or invitation and no such communication to shareholders as is contemplated by the statute. Plaintiffs' attempt to explain away this provision of our definitional statute is, we think, without merit. Plaintiffs contend that, in the context of open market purchases, a tender offer would be "made" when the buy order was entered that would increase the offeror's holdings above 5%. At that time, plaintiffs argue, the critical offer is "given" to the offerree. Plaintiffs cite no authority to support such an interpretation. The obvious inference to be drawn from the provision that a direct offer be *conveyed* from offeror to shareholder is that ordinary open market purchases[7] are not within the Act's coverage.

The last sentence of the definitional statute clearly indicates when a tender offer is deemed to have been "made." It is "made" when the offer or invitation is "first published or sent or given to the offeree." G.S. § 78B-2(14). In an open market purchase, there is nothing to *publish* nor is there anything to *send* or *give* to the offeree.

---

[7] We use the term "ordinary open market purchases" to mean transactions which are accomplished through the ordinary give-and-take of the marketplace and which are not effected or accompanied by additional pressures on the shareholders to sell.

We note also that the language, "published or sent or given to" is the precise language employed in Section 14(d)(1) of the Exchange Act, 15 U.S.C. § 78n(d)(1), to indicate the effective date of a tender offer under federal law. The drafters of the North Carolina legislation must have placed some reliance on the federal statute, its language and meaning, in preparing the state legislation.

Moreover, we do not find persuasive plaintiffs' emphasis on the disjunctive nature of the North Carolina definitional statute. We find nothing to support plaintiffs' contention that the phrase "offer to purchase" was intended to embrace open market purchases while the phrase "invitation to tender" was separately intended to embrace the conventional tender offer. Indeed, we find that the terms are simply different legislative expressions embracing the same concept of an offeror expressing a desire to purchase shares of stock from corporate shareholders through slightly different means and that each term encompasses only "conventional" tender offers. It is our understanding that in making a tender offer, an offeror expresses its offer either in terms of an offer to purchase the shares owned by shareholders of a company or in terms of an invitation to these shareholders to tender their shares to a depositary who will hold the shares pending ultimate purchase by the tender offeror. The difference, if any, is subtle and is in form, not substance. Apparently, it is typical for conventional tender offers to be couched in terms of "offers to purchase" rather than "invitations to tender." *Smallwood v. Pearl Brewing Co.*, 489 F. 2d at 569-97. In *Smallwood*, the court noted that "in conventional tender offers the offeror typically *offers to purchase* all or a portion of a company's shares at a premium price . . . .' *Id.* at 597 n. 22.

Our conclusion that the North Carolina Act does not apply to open market transactions is buttressed by a review of numerous provisions of both G.S. 78B-3 and 78B-4 which could not possibly apply to the open market transaction situation. G.S. 78B-3(1) provides in part that every tender offer shall provide that the offer may be withdrawn by any offeree at any time up to three days before the termination of the effectiveness of the tender offer and that the period of effectiveness of any tender offer shall not be less than twenty-one days from the date the tender offer is made. Clearly, this provision cannot apply to an open market purchase on a stock exchange in which the purchase and sale is complete and final upon execution of the trade and must be consummated by delivery of the

stock certificates and payment within five business days of the trade without privilege for alteration, withdrawal or rescission. Regulation T, Federal Reserve Board, 12 CFR ¶ 220.3 (1980) [hereinafter "Regulation T"]; Rule 64, New York Stock Exchange, 2 N.Y. Stock Exchange Guide (CCH) ¶ 2064 (1978) [hereinafter "Rule 64"]. G.S. 78B-3(2) provides in part for a *pro rata* acceptance of securities by the offeror if more are tendered "than the offeror is bound or willing to accept." The result, if more shares were offered than the offeror had offered to purchase, would be that prior purchases would have to be somehow undone and then a proration of each sharehoder's stock would be implemented. Such a requirement clearly cannot be applied to trades executed on a major stock exchange. Regulation T, *supra*; Rule 64, *supra*.

Additionally, G.S. 78B-3(3) requires that all offerees receive the same amount of consideration per share; if the consideration offered is increased at any time during the pendency of the offer, the increase must be paid to *all* whose shares are purchased even if the purchase was consummated prior to the increase in consideration. Applying such a provision to the open market situation would mean that if different prices were paid for stock purchased in the open market — an obviously normal occurrence over almost any period of time — then all offeree-stockholders could, under the terms of that provision, require the offeror to pay all offering shareholders the highest price paid for any stock. The chaos that would result in the marketplace from the application of this requirement and the impossibility of administering such a provision in the open market context, where every transaction is final and is not subject to revision, shows with abundant clarity that our Legislature could not have intended this provision to apply to purchases in the open market.

Additionally, plaintiffs themselves concede that the above noted provisions, the entirety of G.S. 78B-3, "as a practical matter" *cannot* apply to open market purchases. Plaintiffs contend, however, that the inapplicability of G.S. 78B-3 to the open market "tender offer" does not render their position untenable because the inapplicability of some of the Act's provisions to certain situations was anticipated and partial application of the Act was expressly authorized by the Act's severability clause. That clause provides:

> If any provision or clause of this Chapter or application
> thereof to any person or circumstances is held invalid,

such invalidity shall not affect other provisions or appli-
cations of this Chapter which can be given effect without
the invalid provision or application, and to this end the
provisions of this Chapter are declared to be severable.

G.S. § 78B-11(Cum. Supp. 1979). Because of this provision, plain-
tiffs argue, the disclosure requirements are still valid and must be
applied in the open market context. Plaintiffs contend that the
disclosure portion of the Act is its fundamental purpose and that,
should we decide that the Act does not require an offeror to employ
a conventional tender offer, then the disclosure provisions of the Act
remain applicable by virtue of the severability clause.

Plaintiffs' reliance on the severability clause is misplaced.
While the severability clause obviously protects other provisions of
the Act from invalidity due to a finding that one or more provisions
are invalid, a severability is relevant to a decision only when the
validity of a *particular* provision of the Act is at issue. Here, the
inapplicable provisions of G.S. 78B-3 remain relevant to our consid-
eration *in determining legislative intent* with respect to the applica-
tion of the Act as a whole to open market purchases. Clearly, in
interpreting the legislative intent, we cannot ignore all the provi-
sions of the Act simply because it contains a severability clause
common to most statutes enacted by our Legislature. Moreover, we
note that G.S. 78B-3 is entitled "*Mandatory Provisions* of and Lim-
itation of Tender Offers" (emphasis added). The statute expressly
states that "the following provisions apply to *every* tender offer"
(emphasis added). Because G.S. 78B-3 is, by its express terms,
mandatory in application to *every* tender offer, we must decline to
interpret and apply the severability clause to convert the denomi-
nated mandatory requirements into permissive ones. In so constru-
ing the Act, we are guided by a well-established canon of statutory
construction:

In order to discover and give effect to the legislative
intent we must consider the act as a whole, having due
regard to each of its expressed provisions; for there is no
presumption that any provision is useless or redundant.
That the act consists of several sections is altogether
immaterial on the question of its unity. "The construction
of a statute can ordinarily be in no wise affected by the
fact that it is subdivided into sections or titles. A statute
[is] passed as a whole and not in parts or sections and is

> animated by one general purpose or intent. Consequently
> the several parts or sections of an act are to be construed
> in connection with every other part or section and all are
> to be considered as parts of a connected whole and har-
> monized, if possible, so as to aid in giving effect to the
> intention of the lawmakers."

*Jones v. Board of Education,* 185 N.C. 303, 307, 117 S.E. 37, 39 (1923) (citations omitted).

We will not apply the severability clause to vary and to contradict the express terms of a statute, for we cannot believe the Legislature intended such a result. Construing "tender offers" as broadly as plaintiffs would have us produces an absurd result. On the other hand, if "tender offer" under our Act was intended to cover only conventional tender offers, as we believe it does, each provision of the single regulatory scheme enacted by our Legislature is harmonious one with the other.

Moreover, in addition to the provisions of G.S. 78B-3, certain provisions of G.S. 78B-4, *the disclosure statute of the Act,* are impossible of application to open market transactions. Even G.S. 78B-4(a), requiring compliance with the remaining provisions of the Act and disclosure thirty days prior to the making of the "tender offer," seems inconsistent with the concept of open market stock trading as we understand it. Stock market prices, as even the most casual observer knows, change constantly and the market price at the end of a thirty-day period would almost always be different from that announced thirty days before. Technically, a disclosure through public announcement could be made thirty days prior to the trading period on a stock exchange, but it is inconceivable to us that our Legislature would, *sub silentio,* attempt statutorily to inject such an inconsistent and unusual requirement into the workings of the free marketplace. Moreover, G.S. 78B-4(b) requires the disclosure of "all of the terms and conditions of the proposed tender offer." In the workings of the stock marketplace, however, the terms and conditions of a purchase cannot be accurately predicted, and such a requirement seems incongruous.

G.S. 78B-4(b) also requires that the disclosure statement materially specify the amount of all funds to be used, and G.S. 78B-4(g) provides for a written notice to all shareholders of the company containing, *inter alia,* "the amount of the securities covered by the

proposed tender offer," "the date on which such offer is expected to be made" and "the consideration proposed to be offered." Again, such provisions seem wholly inapplicable to the open market transaction in which the purchaser often does not know the amount of funds that will be required, exactly how many shares will be acquired or what the total consideration will be until after all purchase transactions are final.

If the terms of the original tender offer are revised, a statement containing the terms and conditions of the revised offer and an explanation of the changed terms must be filed with the Secretary of State and delivered to the principal office of the target company at least six days before the revisions become effective. G.S. § 78B-4(f). Purchases made on the open market are rarely identical in terms, and an advance prediction of the terms on which a single purchase will be made is impossible. Additionally, each purchase is final upon execution and cannot thereafter be modified or revoked. We cannot believe that the Legislature would impose upon tender offerors a requirement that is impossible to meet.

In a word, the provisions noted above, and others, are simply inconsistent with the normal operation of the open stock market, would be unworkable in an open market context, and, indeed, appear appropriate only when applied to the situation of a conventional tender offer.

The language of a statute should always be interpreted in a way which avoids an absurd consequence: "A statute is never to be construed so as to require an impossibility if that result can be avoided by another fair and reasonable construction of its terms." *Hobbs v. Moore County*, 267 N.C. 665, 671, 149 S.E. 2d 1, 5 (1966); *accord, In re Annexation Ordinance*, 284 N.C. 442, 202 S.E. 2d 143 (1974); *Town of Hudson v. City of Lenoir*, 279 N.C. 156, 181 S.E. 2d 443 (1971).

### B.

Plaintiffs also advance the proposition that, since the provisions of G.S. 78B-3 can be applied only in the context of a formal tender offer wherein a depositary for the tendered shares is used, we should construe that statute to require use of a conventional tender offer by an offeror who seeks to acquire in excess of 5% of the stock of a subject company. Put another way, plaintiffs argue that the effect of G.S. 78B-3 is to require persons seeking to purchase

more than 5% of the voting stock of a subject company to use the conventional tender offer so that all shareholders of the subject company will receive the information the Legislature has deemed necessary to an informed decision. Such reasoning is, we think, strained and illogical. First, it assumes that the offeror has made purchases that constitute a tender offer under the Act, a proposition we have rejected above. Moreover, had our Legislature any intent to restrict the permissible methods of corporate takeover, as that here argued by plaintiffs, it surely would have said so in understandable language. In support of their argument, plaintiffs cite us to *Telvest, Inc. v. Bradshaw*, 618 F. 2d 1029 (4th Cir. 1980), which they contend interprets the Virginia Takeover Bid Disclosure Act to require use of a conventional tender offer in lieu of open market purchases when the object of the purchaser is to gain control and when the acquisition would increase the purchaser's holdings beyond the 10% threshold. The circuit court found error in a lower court ruling enjoining application of the Virginia Takeover Bid Disclosure Act to open market purchases. *Telvest* has no application here. The Virginia act unquestionably was intended to cover takeovers effected through open market purchases.[8] In *Telvest*, the Fourth Circuit merely reversed the order of a district court enjoining application of the act to open market purchases because the trial court had not properly applied the balance-of-hardship test[9] in considering whether to issue the temporary injunction. While the effect of the Virginia statute may be to require that acquisitions be made through a conventional tender offer, we think the relevant Virginia statute and its legislative history clearly are distinguishable from the North Carolina Act. Virginia, unlike North Carolina, has specifically dealt with the open market transaction problem. Our Legislature has equal ability to handle the open market transaction situation in similar plain legislative language. Had our legislators intended to limit the means of acquiring corporate control to the conventional tender offer methods, we think they would have

---

[8] As originally enacted, the Virginia act *specifically exempted* open market purchases in former Va. Code Ann. § 13.1-529(b)(iii). That *exemption* was narrowed substantially by a 1979 amendment of that provision. The amendment added a proviso limiting the open market exemption to only those open market purchases by a purchaser who had acquired *no more than 1% of the outstanding shares of the class* purchased during the preceding six months.

[9] *See Maryland Undercoating Co. v. Payne*, 603 F. 2d 477 (4th Cir. 1979); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F. 2d 189 (4th Cir. 1977).

Sheffield v. Consolidated Foods

said so; the absence of any express intent and the strained interpretation necessary to reach the result urged upon us by plaintiffs indicate that such was not their intent.

C.

Plaintiffs next call to our attention the six separate types of offers which are expressly exempt from the North Carolina Act and contend that the subject matter of the exemptions shows that the Act covers open market purchases. An "exempt offer" is defined as being any one of the following:

a. An offer made by the subject company or any issuer of equity securities to purchase its own equity securities or equity securities of its subsidiary;
b. Offers to purchase equity securities from not more than 25 offerees within a twelve-month period;
c. An offer, if the acquisition of any equity security pursuant to the offer, together with all other acquisitions by the offeror and his associates of securities of the same class during the preceding 12 months, would not exceed two percent (2%) of the outstanding securities of such class;
d. An offer to purchase equity securities of a class not registered pursuant to section 12 of the Securities Exchange Act of 1934;
e. An offer that is subject to approval by the shareholders of the subject company at a meeting for which proxies have been solicited pursuant to section 14 of the Securities Exchange Act of 1934; or
f. Bids made by a registered broker-dealer in the ordinary course of his business and not with the purpose of changing the control of an issuer of equity securities.

G.S. § 78B-2(7)(Cum. Supp. 1979).

Consolidated has not argued that its activities fall within any of the statutory exemptions. Plaintiffs contend that since G.S. 78B-2(7)(f) exempts certain open market purchases from the Act when the purchaser does not have the purpose of changing the control of the target corporation, the Act must, therefore, apply to open market purchases. Plaintiffs reason that a contrary interpretation would render this particular exemption unnecessary because there would be no need to exempt certain open market purchases from

the Act if they were not within the coverage of the Act.

Plaintiffs' reliance on the statutory exemptions is misplaced. The cited exemption nowhere refers to open market purchases. Plaintiffs obviously interpret the subsection's reference to "registered broker-dealer[s]," to imply reference to open market transactions. Such, however, is not necessarily the case. While the services of "brokers" or "dealers" are almost always used in connection with the open market purchases, their services are certainly not limited to such transactions. The financial pages of newspapers and other publications are replete with advertisements noting that some "broker" or "dealer" has effected the private negotiations of some other type of security transaction not effected on the open market. Indeed, broker-dealers are almost always used in connection with *conventional* tender offers. Moreover, we note that the counterpart statutes in at least four other states which also contain broker-dealer exemptions have been held inapplicable to open market transactions. *Chromalloy American Corp. v. Sun Chemical Corporation*, 483 F. Supp. 116 (E.D. Mo. 1980) (holding that neither the Missouri nor Delaware Takeover Acts applied to open market purchases); *UV Industries, Inc. v. Sharon Steel Corporation*, No. 79-58-SD (D. Maine March 13, 1979) (holding that the Maine Takeover Act did not apply to open market purchases); *Cutler-Hammer, Inc. v. Tyco Laboratories, Inc.*, No. 78-C-221 (E.D. Wisc. April 28, 1978) (holding that neither the Delaware nor Wisconsin Takeover Acts apply to open market purchases).

## VI.

We next turn to a review of federal decisions interpreting the meaning of tender offer under the Williams Act. Plaintiffs contend that we should not do so because the meaning of tender offer under the Williams Act has been developed by judicial and administrative interpretations of the term, while under the North Carolina Act the statutory definition should control. Plaintiffs are correct, as we have noted above, in noting that the Williams Act does not contain a definition of tender offer, while the North Carolina Act does. We disagree with plaintiffs, however, that this distinction compels us to ignore the decisions construing the Williams Act. First, as discussed in the preceding section of this opinion, we find that the North Carolina definition embraces only the conventional tender offer addressed by Congress in enacting the Williams Act. We have

Sheffield v. Consolidated Foods

also noted above that the North Carolina Legislature used, in some instances, exact language from the Williams Act and otherwise employed strikingly similar language. When a term has long-standing legal significance, it is presumed that legislators intended the same significance to attach by use of that term, absent indications to the contrary, and when language or statutes are adopted from another state or country, constructions placed on such language or statutes are presumed to be adopted as well. *See* 73 Am. Jur. 2d *Statutes* § 239 (1974).

Since the Williams Act does not define the term "tender offer," it is not surprising that the courts and commentators have enunciated numerous definitions. Our review of the authorities, however, discloses that the differences are subtle and the characteristics of a typical tender offer are well recognized. It is almost universally agreed that the term "tender offer" does not include open market purchases alone, even if aimed at acquiring control, unless there is concomitant pressure on shareholders greater than that in other open market transactions. *See* E. Aranow, H. Einhorn & G. Berlstein, *Developments in Tender Offers for Corporate Control* 11-13 (1977); Einhorn & Blackburn, *The Developing Concept of "Tender Offer": An Analysis of the Judicial and Administrative Interpretations of the Term,* 23 N.Y.L. Sch. L. Rev. 379, 380-82 (1978).

In *Brascan Ltd. v. Edper Equities Ltd.,* 477 F. Supp. 773, 790-91 (S.D.N.Y. 1979), the court stated:

> The consequence of bringing such large scale open market and privately negotiated purchases within the scope of the Williams Act would be to rule, in effect, that no large scale acquisition program may be lawfully accomplished except in the manner of a conventional tender offer. While this may be a sensible legislative provision ... there is nothing in the legislative history of the text of the Williams Act which suggests that it intended to bring about such consequences.

The legislative history is supportive of this view. Perhaps the best and most succinct descriptions of a "tender offer" is that contained in the House Report of the Committee on Interstate and Foreign Commerce, which held hearings on the proposed Act:

> The offer normally consists of a bid by an individual or

group to buy shares of a company — usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain conditions are met.

H. R. Rep. No. 1711, 90th Cong., 2d Sess., 1, reprinted in [1968] U.S. Code Cong. & Ad. News 2811, 2811. The quoted definition has received widespread recognition by the courts. *E.g., Smallwood v. Pearl Brewing Company*, 489 F. 2d 579; *Dyer v. Eastern Trust and Banking Company*, 336 F. Supp. 890, 908 (D. Maine 1971).

Plaintiffs correctly note that several courts and commentators have taken the position that other unique methods of stock acquisition have been treated as tender offers for purposes of the statute. Our research of these authorities reveals, however, an underlying element in most which is absent from the case at bar: *pressure on shareholders to make uninformed, ill-considered decisions to sell.*

We glean from the proceedings leading to enactment of the Williams Act that the primary concern of Congress was with the potential pressure on shareholders to make hurried and ill-considered decisions to sell. *See Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 Before Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 17 (1967) (statement of SEC Chairman Cohen). The introducers of the legislation were obviously concerned that shareholders were unable to make knowledgeable, carefully considered decisions in the conventional cash tender offer context. This was so, first, because no disclosure by the offeror was required so the shareholder could not make informed decisions as to whether to sell his holdings or maintain his investment in a company likely to change hands. The shareholder often did not know the identity of the real party behind the tender offer. At the same time, the premium price and the first come, first served condition tended to pressure the shareholder into selling quickly. Section 14(d)(1) of the Exchange Act was intended to ensure the disclosure necessary for an informed decision in a potential takeover situation, while Sections 14(d)(5)-(7) were designed to permit the shareholders sufficient opportunity to evaluate the information disclosed without disadvantaging themselves with regard to other tendering shareholders, and Section 14(e) guaranteed that even in the absence of an

immediate takeover threat, as well as in other situations in which Sec. 14(d)(1) would not apply, no fraud would be permitted.

The legislative history of the Williams Act makes clear that open market and negotiated purchases are not subject to the early disclosure provisions contained in Section 14(d)(1) because of the disruptive effect this could have on these modes of securities acquisition.[10]

The same reasoning would bar the application of other sections of the Act. In ordinary market transactions, no pressure is applied by the prospective purchaser on the selling shareholder; the latter reaches his decision to sell independently. The significant factors emphasized by the federal courts in determining whether a conventional tender offer has been made under the Williams Act have been summarized to include:

> (1) the extent of solicitation, whether systematic, widespread and active, or private and sporadic;
> (2) whether the manner of the solicitation was such as to exert pressure on a potential seller by conventional tender offer techniques, such as limitation on decisional time frame, fixed premium price, deposit provisions, or similar requirements;
> (3) the character of solicited shareholders as a gauge of actual need for the statute's protection: whether presumably insulated from offeror pressure, such as a small and powerful insider group, or major or institutional holders, or more vulnerable, such as the small public investor;
> (4) whether there is evidence of actual negotiation des-

---

[10] *See* 113 Cong. Rec. 854-56 (1967); *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 Before Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 16, 17, 24-25, 36 (1967) (statement of SEC Chairman Cohen). In introducing the bill in the Senate, Senator Williams stated:

> Substantial open market or privately negotiated purchases of shares may . . . relate to shifts in control of which investors should be aware. While some people might say that this information should be filed before the securities are acquired, disclosure after the transaction avoids upsetting the free and open auction market where buyer and seller normally do not disclose the extent of their interest and avoid prematurely disclosing the terms of privately negotiated transactions.

113 Cong. Rec. 856.

pite pressure or sophistication;

　　(5) whether the substantive provisions, sections 14(d) (5)-(8), of the Act are mechanically applicable to a challenged program; and

　　(6) whether control of the corporation is the aim of the offeror.

Note, Cash Tender Offers: A Proposed Definition, 31 U. Fla. L. Rev. 694, 714-15 (1979) (footnotes omitted).

　　In several court actions, the SEC has argued that numerous factors should be considered in determining whether a defendant's activities constituted a tender offer. They are whether there is active and widespread solicitation of shareholders; whether the solicitation is made for a large percentage of the issuer's stock; whether there is a premium offered over market price; whether the terms of the offer are firm rather than negotiable; whether the offer is contingent on tender of a fixed number of shares; whether the offer is open for a limited period of time; whether the offerees are subjected to pressure to sell their stock; and whether public announcements of a purchasing program precede or accompany rapid accumulation. *E.g., Brascan Ltd. v. Edper Equities Ltd.*, 477 F. Supp. at 791 & n. 13; *see Wellman v. Dickinson*, 475 F. Supp. 783, 823-24 (S.D.N.Y. 1979).[11]

　　Unquestionably, the most significant factor considered by the courts in determining whether the offeror's tactics were tantamount to a conventional tender offer has been that of attendant pressure on shareholders. *See S-G Securities, Inc. v. Fuqua Investment Co.*, 466 F. Supp. 1114, [1979] Fed. Sec. L. Rep. (CCH) ¶ 96,750 (D. Mass. 1978); *Financial General Bankshares, Inc. v. Lance,* [1978] Fed. Sec. L. Rep. (CCH) ¶ 96,403 (D.D.C. 1978); *Loews Corp. v. Accident & Casualty Insurance Co.*, No. 74 C 1396 (N.D. Ill. July 11, 1974); *Cattlemen's Investment Co. v. Fears,* 343 F. Supp. 1248 (W.D. Okla. 1972), *vacated per stipulation,* No. C 72-152 (W.D. Okla. May 8, 1972). Clearly, open market purchases which are accompan-

---

[11] While the Securities and Exchange Commission has taken the position that forms of open market purchase programs which are, in effect, tender offers should be regulated as such under the Williams Act, it has excluded from the tentative definition, published for comment, offers through a broker or dealer at the then current market price, in the ordinary course of business and without solicitation of any order to sell on the part of the offeror or broker or dealer. SEC Release Number 34-16385, 44 Fed. Reg. 70349 (Dec. 6, 1979).

Sheffield v. Consolidated Foods

ied by pressure on shareholders to make hurried decisions with little information would pose dangers which the Williams Act and the North Carolina Act were designed to prevent and should be treated as conventional tender offers. "The purchaser, by judiciously managing publicity releases concerning the projected number of shares to be purchased, price to be paid, and expected length of time necessary for the purchases to be completed, can make purchases using all the techniques of a tender offer without ever making a formal offer." Einhorn & Blackburn, *supra*, 23 N.Y.L. Sch. L. Rev. at 386 (footnote omitted). A review of several federal cases is illustrative. In *Cattlemen's Investment Co. v. Fears*, 343 F. Supp. 1248 (W.D. Okla. 1972), the court held that the active and widespread solicitation of shareholders by mail, telephone and personal visits directed toward the purchase of shares and an effort to acquire corporate control, contained all the potential dangers which Section 14(d) of the Exchange Act sought to alleviate and therefore constituted a tender offer under the Williams Act. The filing of suit followed a 5% shareholder's attempt to gain control of the target corporation through solicitation by employees of his separately controlled corporation. Purchases were made over a six-week period during which the offeror doubled his holdings in the target corporation without making a preacquisition disclosure as required by the Williams Act.

It is arguable, of course, that this decision stands only for the proposition that allegedly private offers must be truly private to avoid regulation. More logically, however, the decision appears to be an attempt by that court to include privately negotiated transactions within the scope of the Williams Act. However, the court's opinion clearly indicates that the Exchange Act is applicable in such a situation only if the solicitation of shareholders is widespread and has the potential of forcing shareholders into hurried investment decisions. Under those circumstances, a private transaction is, in practice, indistinguishable from the traditional tender offer and a regulation appears more logical. While the court obviously extended the meaning of "tender offer" beyond that conventionally accorded the term, it did identify the threshold characteristic necessary for application of the Williams Act — the active, widespread solicitation of shareholders.

In *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F. 2d 1195 (2d Cir. 1978), the court rejected the contention that whenever

a purchaser of stock intends to acquire and exercise control of a company, its actions should be subject to the provisions of the Williams Act. *Kennecott* resulted from an ongoing proxy contest begun by Curtiss-Wright for control of Kennecott. Kennecott had alleged that Curtiss-Wright's quiet acquisition of some 9.9% of its outstanding shares over a three-and-a-half-month period was a tender offer in violation of Section 14(d) of the Williams Act. Curtiss-Wright had purchased 3,287,400 shares of Kennecott on forty-three trading days during that period. On seventeen of those days, Curtiss-Wright's purchases exceeded 50% of the daily volume of trading on the New York Stock Exchange. While most of the stock was acquired on the New York Stock Exchange and other national securities exchanges, several transactions were not ordinary market purchases. For example, White, Weld and Company, Curtiss-Wright's broker, solicited fifty Kennecott shareholders off the floor of the exchange, consummating sales with willing sellers on the floor of the exchange. Also, Salamon Brothers, another Curtiss-Wright broker, solicited approximately a dozen institutional holders of Kennecott, consummating an unspecified sale off the exchange.

In holding that Curtiss-Wright had not made a tender offer, the court of appeals emphasized that no pressure was exerted on sellers other than the normal pressure of the marketplace. The court also noted that Kennecott's proposed interpretation would render the 5% filing provisions of the Act meaningless except in cases where the purchaser did not intend to obtain a controlling interest.

Of particular significance is the court's conclusion that certain provisions of the Act would be impossible to perform if the liberal interpretation of tender offer was applied. The court stated:

> Although broad and remedial interpretations of the Act may create no problems insofar as the anti-fraud provisions of subsection (e) of section 78(n) are concerned, this may not be true with regard to subsections (d)(5)-(d)(7). Subsection (d)(5) provides that securities deposited pursuant to a tender offer may be withdrawn within seven days of the publication or delivery to shareholders of the tender offer or at any time after sixty days from the date of the original tender offer. Subsection (d)(6) requires offerors to purchase securities on a *pro rata* basis where more are tendered than the offeror is bound or willing to

take. Subsection (d)(7) provides that where the offeror increases the offering price before the expiration of his tender offer, those tenderors whose stock has already been taken up are entitled to be paid the higher price. *It seems unlikely that Congress intended "tender offer" to be so broadly interpreted as to make these provisions unworkable.*

*Kennecott Copper Co. v. Curtiss-Wright Corp.*, 584 F. 2d at 1207 (emphasis added); *see Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 356 F. Supp. 1066, 1073-74 (S.D.N.Y.), *aff'd*, 476 F. 2d 687 (2d Cir. 1973).

In *S-G Securities, Inc. v. Fuqua Investment Co.*, 466 F. Supp. 1114 (D. Mass. 1978), a case cited to us by plaintiffs, the court acknowledged that defendant's actions in acquiring the stock in question did not constitute a "tender offer" as that term had been conventionally understood but held that methods of acquisition other than the conventional tender offer fall within the purview of the Williams Act. In so holding, however, the court stressed that the liberal interpretation of the Act would be applied only *"where such transactions posed the same potential dangers that § 14(d) was designed to alleviate." Id.* at 1124 (emphasis added).

Moreover, in distinguishing *Kennecott* and other cases, the court stressed that the purchases in question in those cases were consummated prior to any widespread public announcement of a conventional tender offer. In *S-G Securities*, on the other hand, the purchases in question were preceded by two or three widely publicized press releases which outlined with some specificity the details of the proposed buying program. The court noted that such publicity created a risk of the pressure on sellers that the disclosure and remedial tender offer provisions of the Williams Act were designed to prevent. The court specifically held that where there is (1) a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target company for the purpose of acquiring control thereof and (2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases, such actions constitute a tender offer for purposes of Section 14(d) of the Exchange Act. The *S-G Securities* court left undisturbed the proposition that a pure open market purchase program does not constitute a tender offer, indicating instead only that widespread public announcements preced-

ing open market purchases would expose such acquisition to the strictures of the Williams Act.

In *Wellman v. Dickinson,* 475 F. Supp. at 820, the court, referring to *Kennecott,* stated that "the transactions in Kennecott were in large part effectuated on the floor of the [New York Stock] Exchange and it is clear that open market purchases [do not constitute a tender offer and therefore] are not subject to Section 14's preacquisition filing requirements."

In the case of *Strode v. Esmark, Inc.,* [1978] Fed. Sec. L. Rep. (CCH) ¶ 97,538 (Cir. Ct. Ky. 1980), a state circuit court upheld the Kentucky Takeover Bids Disclosure Act. The facts in *Strode,* however, are markedly different from those in the instant case. There, the offeror's purchases of the target corporation's stock "led the market" on bidding days by having the highest bid and by keeping the bid at the top of the list of market makers appearing to the general public. The court noted that such a bidding strategy operated as a signal to the marketplace that the offeror's broker was continuously interested in purchasing the target company's stock and constituted a continuing invitation to purchase shares. That strategy was accompanied by telephone calls in an effort to obtain stock and by the broker's contacting other brokerage firms and institutional holders of the target company's shares to indicate a continuing interest in the purchase of substantial amounts of shares with the request that if any of the parties were able to obtain the target shares, the broker would like for them to offer those shares to it first. This, the court noted, resulted in essence in the offeror's offering a premium and engaging in active solicitation through its broker. The court also noted that the offeror continued acquiring stock by this means subsequent to public disclosure through other filings in which the disclosed purpose of the transaction was acquisition of the target corporation.

The repeated emphasis by the courts on shareholder pressure is, we think, consistent with the acknowledged primary purpose of the Williams Act — to protect the public investor by providing him with otherwise unobtainable information without which an informed decision cannot be made, *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S. Ct. 926, 946, 51 L. Ed. 2d 124, 149 (1977); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S. Ct. 2069, 2075-76, 45 L. Ed. 12, 20-21 (1975).

Comparison of the factors emphasized by the reviewing courts with the record before us compels the conclusion that the tactics employed by Consolidated in purchasing the Hanes shares were not tantamount to a "tender offer" within the meaning of the Williams Act: (1) There was no solicitation of shareholders by Consolidated or its brokers, (2) Consolidated's activities resulted in no unusual pressure on the shareholders, such as rapidly accelerating price, or decisional time frame in which to sell, (3) the substantive provisions of the Williams Act, like those of the North Carolina Act, would not have been mechanically applicable.

Under the factors urged for consideration by the Securities and Exchange Commission, we would reach the same conclusion: (1) there was no active and widespread solicitation of shareholders, (2) there was no premium offered over market price, (3) Consolidated's "offer" of terms was subject to the workings of the normal marketplace, (4) the offer was not contingent on tender of a fixed number of shares, (5) the "offer" was not open for a limited period of time, (6) the shareholders were not subjected to pressure to sell their stock, and (7) there were no public announcements of a purchasing program preceding or accompanying the rapid accumulation of Hanes stock.

Plaintiffs here were subject to no more than the normal workings of the marketplace, a risk assumed by all those who elect to invest funds in the common stock of large corporations. To argue that the protections of the federal and state legislation should be extended to such shareholders because the activities of the offering company generated some increase in the price of the stock on the open exchange is to stretch the meaning of the legislation far beyond its obvious intent. The argument that the natural rise in price in the marketplace generated by the presence of an eager buyer is tantamount to offering a premium to the shareholders, has been expressly rejected. *City Investing Company v. Coons*, No. 2-779A211 (Ct. App. Ind. October 13, 1980) (Indiana Takeover Offers Act not applicable to open market purchases).

As one commentator has noted:

It is hard to imagine ... an offer which is made at current market price ... , which is for an unlimited number of shares' and is open for an unlimited period of time, and which is absent an attendant pressure on shareholders or

any public announcements of purchasing programs that can still be said to compel any investor, even a relatively unsophisticated investor to make a hurried, uninformed investment decision.

Frome, *Expanded Definition of Tender Offer*, *N.Y.L.J.*, Feb. 29, 1980, at 2, col. 4.

## VII.

In light of our holding above that the North Carolina Act is not applicable to purchases of securities on the open market, it is unnecessary for us to address Consolidated's contention that the North Carolina Act is unconstitutional by virtue of conflict with the supremacy and commerce clauses of the United States Constitution.[12]

The order of the trial court allowing summary judgment for defendants is

Affirmed.

Justice MEYER took no part in the consideration or decision of this case.

---

[12] We note only that decisions from the several jurisdictions are conflicting on this point and that one commentator has noted that the North Carolina Act would probably not withstand judicial scrutiny in response to an attack upon its constitutionality. Comment, The North Carolina Tender Offer Disclosure Act: Congenitally Defective?, *supra*. Another has suggested that, should we hold the Act valid, the Act will then need amending to preserve its validity against the preemptive effect of the new rule 14(d)-2. Robinson, *North Carolina Corporation Law and Practice* § 7-12 (1980).