Public Utilities Commission
No. 80-396

APPEAL OF NEW ENGLAND POWER COMPANY

(New Hampshire Public Utilities Commission)

December 23, 1980

*Orr & Reno*, of Concord (*Richard B. Couser* orally), for New England Power Company.

*Francis X. Bellotti*, attorney general (*Alan B. Sherr*, assistant attorney general, orally), for the Commonwealth of Massachusetts.

*Dennis J. Roberts, II*, attorney general (*John R. McDermott*, special assistant attorney general, orally), for the State of Rhode Island.

*Edward F. Burke,* administrator (*John R. McDermott,* special assistant attorney general, orally), for the Rhode Island Division of Public Utilities and Carriers.

*Steven D. Stark,* by brief for the amicus curiae Conservation Law Foundation of New England.

*Barto & Gfroerer,* of Concord, and *Spiegel & McDiarmid,* of Washington, D.C., by brief for the amicus curiae Unaffiliated Massachusetts Municipal Wholesale Customers of New England Power Company.

*Gregory H. Smith,* acting attorney general (*David W. Jordan,* assistant attorney general, orally), for the State of New Hampshire.

*William L. Shaine,* of Concord, by brief and orally, for the Legislative Utility Consumers' Council.

*Sulloway, Hollis & Soden,* of Concord, by brief for the amicus curiae Public Service Company of New Hampshire.

DOUGLAS, J. This case involves the validity of an order of the New Hampshire Public Utilities Commission (hereinafter "PUC") pursuant to RSA 374:35 withdrawing from the New England Power Company (hereinafter "NEPCO") permission to transmit hydroelectricity generated in New Hampshire to other States. We affirm the order and remand.

On November 21, 1979, the PUC instituted an investigation under RSA 374:35 to determine whether it should revoke its earlier approval of the exportation of electric power generated by hydroelectric facilities located in New Hampshire. RSA 374:35 provides:

*"Transmitting Electricity Out of the State*

374:35 *Permission Required.* No corporation engaged in the generation of electrical energy by water power shall engage in the business of transmitting or conveying the same beyond the confines of the state, unless it shall first file notice of its intention so to do with the public utilities commission and obtain an order of said commission permitting it to engage in such business. Any such corporation engaged in the business of transmitting or conveying such electrical energy beyond the confines of this state pursuant to such order shall discontinue such business in whole or in part, to such extent and under such conditions as the commission may order, whenever,

after notice to such corporation and hearing thereon, the commission shall find that such electrical energy or the portion thereof affected by said order is reasonably required for use within this state and that the public good requires that it be delivered for such use."

NEPCO moved to dismiss the proceedings for lack of subject matter jurisdiction. The PUC denied the motion. On September 19, 1980, after several hearings, the PUC issued the order in controversy, and NEPCO filed a timely appeal to this court. The order reads as follows:

"ORDERED, that the permission granted New England Power Company (NEPCO) to transmit hydroelectric energy from within the boundaries of the State to outside the State is hereby withdrawn as of thirty (30) days from the date of this Order; and it is

FURTHER ORDERED, that NEPCO make arrangements to sell the previously exported hydroelectric energy to persons, utilities and municipalities within the State of New Hampshire within thirty (30) days of the date of this Order; and it is

FURTHER ORDERED, that upon the completion of both units at Seabrook the Commission will again re-examine the issue of exportation."

We granted a stay of the order to preserve the status quo ante pending our decision on the merits.

I. *Background*

NEPCO is a public utility predominantly engaged in the generation of electricity for sale in the wholesale market. As part of its generating mix, NEPCO owns and operates six hydroelectric generating stations comprised of twenty-seven units along the Connecticut River in New Hampshire and Vermont. All six stations are federally licensed under Part I of the Federal Power Act, 16 U.S.C. §§ 792–823. The twenty-one units located in New Hampshire have a capacity of 420 megawatts.

NEPCO sells the power produced by these stations to wholesale customers in New Hampshire, Massachusetts, and Rhode Island. The energy is dispatched through a regional power-pooling system composed of sixty utilities in New England (NEPOOL), comprising ninety-eight percent of the generating capacity in New England. NEPCO sells seventy-five percent of its power in Massachusetts. Less than six percent of New Hampshire's

population presently receives energy from NEPCO's regular wholesale customers.

Uniquely, while the Connecticut River separates the States of Vermont and New Hampshire, the river up to the low water mark on the Vermont side lies *within* the State of New Hampshire. *Vermont v. New Hampshire*, 289 U.S. 593, 619–20 (1933); *see* RSA 1:1 to :8. The northern part of the Connecticut River is, therefore, owned by the people of the State of New Hampshire. *See McGilvra v. Ross*, 215 U.S. 70, 79 (1909). The right of private parties to use it to produce electricity for use outside New Hampshire has been limited by RSA 374:35, :36, with the PUC, in effect, the citizens' legislatively delegated "trustee."

Pursuant to its statutory authority, the PUC has, from time to time, approved NEPCO's requests to export hydroelectric power. *See, e.g., Connecticut River Power Co. & New England Power Company*, 36 N.H.P.U.C. 302, 311–12 (1954); *Grafton Power Company*, 12 N.H.P.S.C. 194, 201 (1929). NEPCO concedes that since 1926 it or a predecessor company has obtained permission from the PUC to export electricity from all plants in New Hampshire except Vernon Station, which was constructed prior to 1913.

According to the PUC, the surplus of power produced in New Hampshire during the first half of this century justified the PUC's grants of permission to export in those years. In the late 1920's hydroelectricity provided forty-five percent of New Hampshire's energy and, with the exception of Maine, this was the highest percentage of electricity so produced anywhere in the country. In 1951 the percentage had risen to forty-nine percent. Today, the biggest retail seller of electricity in the State, Public Service Company of New Hampshire, serves eighty-three percent of the population, but its generating mix includes only 4.6 percent produced by hydroelectric stations, according to the PUC. NHPUC Report accompanying Order 14,492 at 6 (Sept. 19, 1980).

II. *The Federal Power Act*

NEPCO argues that Parts I and II of the Federal Power Act, 16 U.S.C. §§ 792–824k, preempt RSA 374:35. Traditionally, the regulation of electric utilities was a function performed by State governments under their police power. Federal legislation may supersede such State regulation, but only if Congress expressly so provides or if federal and State laws conflict. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26 (1977). When it enacted Parts I and II of the Federal Power Act, Congress did not expressly preempt State law as it has in other statutes. *See, e.g.,* Depository

Institutions Deregulation and Monetary Control Act of 1980 § 511(a), Pub. L. No. 96–221, 94 Stat. 132 (to be codified in 12 U.S.C. § 86a); Act of December 28, 1979 § 202, amending the Federal Deposit Insurance Act (12 U.S.C. §§ 1811–1831), Pub. L. No. 96–161, 93 Stat. 1233 (to be codified in 12 U.S.C. § 1831a). Our inquiry, therefore, must be whether the federal law so conflicts with State law as to preempt it.

■ Congress's primary objective in enacting Part I of the Federal Power Act, 16 U.S.C. §§ 792–823, was to control comprehensively the development of water power along the nation's navigable waterways through the issuance of licenses to construct and operate dams and reservoirs. *Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 400–05 (1975). Congress did not preempt the entire field of electric utility regulation when it enacted Part I, which left the States with their traditional jurisdiction over electric utilities, except for matters relating to the issuance of licenses. *See First Iowa Coop. v. Power Comm'n*, 328 U.S. 152, 171 (1946). For example, State regulation of intrastate sales of electricity to ultimate consumers, such as the retail customers of Public Service Company of New Hampshire, remains in State hands. 16 U.S.C. § 813.

NEPCO argues that the PUC's interpretation and application of RSA 374:35 conflict with the licensing power of the federal government under Part I. We disagree. The PUC's order does not require compliance with RSA 374:35 as a condition precedent to securing a federal license under Part I. *See First Iowa Coop. v. Power Comm'n, supra* at 170. New Hampshire has not sought to stop hydroelectric development of the Connecticut River and does not challenge the licenses granted to NEPCO over the years under Part I of the Federal Power Act. Because we find that there is no conflict between RSA 374:35 and Part I, we conclude that the federal statute does not preempt the State law.

■ The more difficult question is whether Part II of the Federal Power Act, 16 U.S.C. §§ 824–824k, preempts RSA 374:35. Seven years after the enactment of Part I, Rhode Island sought to regulate the rates at which a utility within that State sold power to a wholesale customer in Massachusetts. The Supreme Court of the United States held that such rate regulation was an impermissible burden on interstate commerce. *Pub. Util. Comm'n v. Attleboro Co.*, 273 U.S. 83, 90 (1927).

As a result of the *Attleboro* decision, there was no regulation of interstate electric rates. Such regulation is within the exclusive

domain of Congress under the commerce clause. *Id.* In 1935, Congress chose to fill the gap by enacting Part II. The legislative history of that amendment includes the following:

> "Title II of the bill makes certain amendments to the present Federal Water Power Act and establishes for the first time regulation of electric utility companies transmitting energy in interstate commerce . . . . Under the decision of the Supreme Court of the United States in *Public Utilities Commission v. Attleboro Steam & E. Co.,* (273 U.S. 83), the rates charged in interstate wholesale transactions may not be regulated by the States. Part II gives the Federal Power Commission jurisdiction to regulate these rates.

H.R. REP. No. 1318, 74th Cong. 1st Sess. 7–8 (1935). Thus, Congress clearly expressed an intention to preempt the field of regulation of rates charged in the *interstate* transmission of electricity.

▮ However, § 201(b) of the statute specifically exempted certain State laws from federal jurisdiction. As enacted, that subsection provided:

> "The provisions of this Part shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but *shall not apply* to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. . . ."

(Emphasis added.) 49 Stat. 847 (current version at 16 U.S.C. § 824(b) (Supp. 1980)).

The legislative history of that section explains the purpose of that language. When the bill reached the House of Representatives, the Senate version did not contain the language regarding "lawful" authority of States to control the flow of hydroelectricity produced by their waters; the House Commerce Committee inserted it. H.R. REP. No. 1318, 74th Cong. 1st Sess. 27 (1935). Said Congressman Rogers of New Hampshire:

> "Just one further word. I do want to call attention, if I have a moment, to the fact that as a result of the service rendered by the junior Senator from New Hampshire

[Senator Fred H. Brown] on the public service commission of our State, we for a long time, have had a public service commission which properly protects the rights of the citizens as against these damnable curses [public utility companies]; but the Senate bill as originally drawn would deprive certain states, I think *five* in all, of certain rights which they have over the exportation of hydroelectric energy which is transmitted across the State line. This situation has been taken care of by the House Committee, and I hope when you come to it, section 201 of part II, that you will *grant* us the privilege to continue, as we have been for *22 years*, to exercise our State right over the exportation of hydroelectric energy transmitted across State lines but produced up there in the granite hills of New Hampshire."

79 CONG. REC. 10527 (1935) (emphasis added). The twenty-two years refers quite obviously to the 1913 legislation in New Hampshire amending the 1911 Public Sevice Commission Act, presently RSA 374:35. Thus the subsection was specifically intended to preserve the power of a State or its commission over exportation of electricity under then-existing laws similar to the New Hampshire statute, which were recognized as valid and lawful. *See Safe Harbor Water Power Corporation*, 5 F.P.C. 221, 235 (1946); *United States v. Public Utilities Comm'n*, 345 U.S. 295, 300 n.4 (1953).

III. *Federal Constitution*

■ The Commonwealth of Massachusetts, and other amici curiae, argue that Congress could not constitutionally enact § 201(b). They assert that, while Congress may exempt *all* States from an exercise of congressional authority under the commerce clause, it may not legislate with respect to some States and exempt others. But the amici present no authority. Nothing requires that the commerce clause be exercised in a totally uniform manner geographically. *Secretary of Agri. v. Cent. Roig Co.*, 338 U.S. 604, 616 (1950). In fact, the Supreme Court has expressly noted that there is no rule that Congress must legislate equally with respect to all States or not at all. *South Carolina v. Katzenbach*, 383 U.S. 301, 328–29 (1966).

■ The amici argue that the privileges and immunities clause of the United States Constitution, U.S. CONST. art. IV, § 2, also prohibits such an act of Congress. The only authority they are able

to cite is a footnote in a treatise, L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-31 at 403 n.18 (1978). We are unable, however, to find a single case that holds that the privileges and immunities clause restricts Congress's power under the commerce clause. *See generally Haavik v. Alaska Packers Ass'n*, 263 U.S. 510, 515 (1924); *Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Cir. 1939); *Lung v. O'Cheskey*, 358 F. Supp. 928, 931 (D.N.M.), *aff'd mem.*, 414 U.S. 802 (1973). The fact that Article IV generally applies to the States leads us to conclude that the privileges and immunities clause was meant to apply to the States and not to Congress.

■ ■ Massachusetts argues that if the PUC order goes into effect consumers in that State will be deprived of property without just compensation in violation of the fourteenth amendment of the U.S. Constitution. We find that argument to be without merit. Massachusetts's argument is based on the speculative premise that NEPCO will be able to increase its rates to consumers in that State to reflect the loss of cheaper hydroelectric power but that NEPCO will not make adjustments to offset the expenses of operating and maintaining those plants. NEPCO, however, is subject to the Federal Energy Regulatory Commission's (herein-after "FERC") jurisdiction in the establishment of rates. 16 U.S.C. § 824d. *Cf. FPC v. Florida Power & Light Co.*, 404 U.S. 453 (1972). FERC has the authority to hold hearings upon the lawfulness of any proposed rate and to suspend a rate change pending the hearing. 16 U.S.C. § 824d(e). The burden of proof that an increased rate is just and reasonable is upon the utility. *Id.* Massachusetts has not shown us that its projected scenario will ever occur. If it does, the Commonwealth may raise its argument at that time.

■ Relying on *Fry v. United States*, Massachusetts argues that the tenth amendment prohibits Congress from exercising its power under the commerce clause "in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." 421 U.S. 542, 547 n.7 (1975). That phrase, however, refers to the function of the States vis-a-vis the federal government and not with respect to other States. The tenth amendment prohibits the federal government from infringing on State sovereignty with regard to "integral governmental functions." *National League of Cities v. Usery*, 426 U.S. 833, 855 (1976). Regulation of electric utilities is not an essential State governmental function, and the tenth amendment does not prohibit the act of Congress in this case.

NEPCO argues that RSA 374:35 as construed and applied in the

PUC order violates the commerce clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3.

 New Hampshire was one of the thirteen sovereign States that created the federal government and delegated to it certain · enumerated powers, among which was the power of Congress to regulate commerce among the States. U.S. CONST. art. I, § 8, cl. 3. Control over the interstate transmission of electricity is within the commerce power of Congress. *FPC v. Union Electric Co.*, 381 U.S. 90, 94 (1965); *Pub. Util. Comm'n v. Attleboro Co.*, 273 U.S. at 86. Congress exercised that power when it enacted the Federal Power Act, 16 U.S.C. §§ 792–825r. In issuing its order, the PUC acted within its authority as expressly preserved by § 201(b) of that act. 16 U.S.C. § 824(b). While it might be questionable, in the absence of § 201(b) of the Federal Power Act, that there would be authority for New Hampshire to interdict the flow of electricity that would otherwise continue to benefit two sister States, *see Philadelphia v. New Jersey*, 437 U.S. 617 (1978), that is not the case here. Congress, through its commerce clause power, may "permit the states to regulate the commerce in a manner which would not otherwise be permissible. . . ." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769 (1945).

NEPCO correctly points out that the United States Supreme Court has ruled that parochial State laws that impede the flow of goods or natural resources into interstate commerce are infirm under the commerce clause. *See, e.g., Hood & Sons v. DuMond*, 336 U.S. 525 (1949) (milk); *Foster Packing Co. v. Haydel*, 278 U.S. 1 (1928) (shrimp); *Oklahoma v. Kansas Nat. Gas Co.*, 221 U.S. 229 (1922) (natural gas). *But see Reeves, Inc. v. Stake*, 100 S. Ct. 2271 (1980) (upholding the right of South Dakota to withhold processed cement, which it produces, from the interstate market). Those cases are distinguishable in that none of them involved the express consent of Congress in the exercise of its commerce power.

 The question remains whether the PUC's order falls within the exemption provided by Congress. NEPCO and the other States argue that the PUC order is an attempt to control electric rates in violation of the commerce clause. They assert that all hydroelectric power goes into an interstate transmission grid and is mixed with other power, but the PUC does not intend that NEPCO cut its lines running from its hydroelectric plants into the grid and construct new lines running only to New Hampshire utilities. Rather, NEPCO argues that the PUC intends that NEPCO simply adjust its rates to give New Hampshire consumers the benefit of the price of hydroelectricity.

The PUC order is plain. Under RSA 374:35 it withdraws permission to export hydroelectric power and orders that it be sold to New Hampshire consumers. Its purpose is to give New Hampshire the benefit of that power of which its residents now get only about six percent. Since the power is presently mixed in the grid, NEPCO must decide what part of the power is being assigned to Massachusetts and Rhode Island in order to determine its charges to customers in those States. It can comply with the PUC's order not to export hydroelectric power by the same method and simply determine that all of the hydroelectric power going into the grid is assigned to New Hampshire. This is not a control of rates but rather a control of the assignment of the power. If NEPCO can now determine that over ninety percent is going outside New Hampshire, it can determine that one hundred percent will remain in New Hampshire.

The PUC does not challenge the jurisdiction of the FERC (as successor to the Federal Power Commission) over utilities selling solely in intrastate markets energy that has been generated wholly or in part from out of State. *See FPC v. Florida Power & Light Co.*, 404 U.S. 453 (1972); *F.P.C. v. Southern Cal. Edison Co.*, 376 U.S. 205 (1964). The latter cases did not turn on the *mere interconnection* of a utility with an interstate transmission grid because just about every utility in the country is so connected. If the matter were that simple, then FERC, and not the fifty State regulatory bodies, would control all but the most remote, miniscule, and obscure utilities in the country.

The PUC did not err in its construction of the State statute at issue and properly gave notice and held lengthy hearings and investigations during the past year. Our sister States could and did fully participate before the PUC.

## IV. *Findings of the PUC*

Next, NEPCO asserts that the PUC's findings are unjust and unreasonable. This court will not overturn the PUC unless its findings are arbitrary, unjust, or unreasonable as a matter of State law. *Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977). The question is not whether *some* power is now needed in New Hampshire but whether the PUC is justified in concluding that *hydro*-generated power "is reasonably required for use within this state and that the public good requires that it be delivered for such use." RSA 374:35.

New Hampshire is the fastest growing State north of Florida and east of the Mississippi River. The population of the State rose

21.5 percent from 1960 to 1970 and 24.6 percent from 1970 to 1980, approximately 1.6 times faster than the entire nation and 1.7 times faster than the region from 1960 to 1970. Rhode Island has actually lost population during the last few years. The growth in power demand in New Hampshire may outpace capacity by 1982–83. We cannot conclude that the PUC was in error or that it did not have sufficient evidence before it when it declined to predict whether the capacity of the Seabrook Nuclear Power Station would alleviate that shortfall.

The PUC concluded that hydroelectric power is cheaper to the extent of approximately $25 million a year, depending on seasonal flow of the river and other factors. That power would help replace the expensive oil-fired generation on which most of New Hampshire now depends. One expert pointed out that the Public Service Company of New Hampshire's rate per kilowatt hour exceeds NEPCO's rate by about 25 percent. Due to line losses, hydroelectric power can be more economically delivered in this State. Rates to New Hampshire consumers are higher due to the lack of access to New Hampshire's major hydroelectric stations' output; the dollar savings to New Hampshire consumers, if the power is sold within this State, would be substantial.

RSA 374:35 clearly authorizes the action of the PUC. Authority under the statute is not confined to situations where there is a shortage of power regardless of price but whenever it is "reasonably required for use within the State." When the cost of power produced by other methods becomes exorbitant, the less expensive hydroelectric power becomes reasonably required for use within the State. The economic needs of New Hampshire consumers are such that the public good requires that the hydroelectric power be delivered for their use instead of being exported. We find no retaliatory or improper motive on the part of the PUC. There is no "public good" in requiring New Hampshire to import expensive OPEC oil so that it may continue to export the cheaper hydroelectric power. We uphold the findings of the PUC.

V. *Implementation*

Finally, NEPCO argues that the PUC order is so vague and ambiguous that it cannot comply. Nothing on the face of the PUC order requires new rates, contract modifications, or accounting adjustments, but these may naturally flow from the export termination. The PUC has required NEPCO "to make arrangements to sell" its hydroelectric power in New Hampshire, and NEPCO must do so. It is not clear to this court how some of these "arrangements" will be made. We therefore remand for the parties

to develop the mechanics of implementation. NEPCO must make appropriate adjustments and filings with the appropriate federal and State administrative agencies to enable New Hampshire to regain the benefit of its hydroelectric power.

*Remanded.*

All concurred.