Merrimack
No. 80–333

### Sharon Steel Corporation & a.

v.

### Frank E. Whaland

July 2, 1981

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester, and *Shearman & Sterling*, of New York (*Danforth Newcomb & a.* on the brief and *Mr. Newcomb* orally), for the plaintiffs.

*Gregory H. Smith*, attorney general (*Andrew R. Grainger*, assistant attorney general, *& a.* on the brief and *Mr. Grainger* orally), for the defendant.

*Hamblett & Kerrigan P.A.*, of Nashua, and *Davis Polk & Wardwell*, of New York (*Steven F. Goldstone & a.* on the brief and *Mr. Goldstone* orally), for the intervenor, Nashua Corporation.

*William H. Shaheen*, United States Attorney for the District of New Hampshire (*James J. Junewicz*, special counsel, *& a.* on the brief and *Mr. Junewicz* orally), for the Securities and Exchange Commission, as amicus curiae.

LAMPRON, C.J. (ret.) This is an interlocutory transfer to this court without ruling of an appeal from a decision of the insurance commissioner to the superior court under section 12 of RSA ch. 421-A (Supp. 1979), this State's "Security Takeover Disclosure Act" (act).

The plaintiffs are Sharon Steel Corporation (Sharon), organized under Pennsylvania law with its principal place of business in Ohio, and Summit Systems, Inc. (Summit), organized under Delaware law with its principal place of business in Florida. They appeal from an opinion of the defendant, Frank E. Whaland, the New Hampshire Insurance Commissioner (commissioner), whose order continued in effect a cease-and-desist order forbidding the plaintiffs from purchasing or offering to purchase, or in any way acquiring or controlling, the stock of Nashua Corporation pending compliance with the act. Nashua Corporation (Nashua) is organized under the laws of Delaware, with its principal place of business in Nashua, New Hampshire. About 1,100 residents of New Hampshire own ten to fifteen percent of Nashua's outstanding shares.

The commissioner's opinion and order were rendered after hearings on Nashua's petition alleging that on March 19, 1980, Summit

and Sharon beneficially owned 476,100 shares of Nashua's common stock, which represented 10.252 percent of its common stock outstanding. Nashua further alleged that the plaintiffs' solicitations of sales, which had resulted in the above acquisition of its stock, constituted a "takeover bid" as defined in RSA 421-A:2 VI (Supp. 1979) and that the plaintiffs had violated diverse sections of RSA ch. 421-A (Supp. 1979). A cease-and-desist order was issued by the commissioner. He also sought an injunction against the plaintiffs, which was granted by the Superior Court (*Cann*, J.) pursuant to RSA 421-A:11 (Supp. 1979).

The issues presented on this transfer are: (1) whether our "Security Takeover Disclosure Act," RSA ch. 421-A (Supp. 1979), which provides that a "takeover bid" does not include "[a]n offer by or through a broker-dealer in the ordinary course of his business without solicitation of orders to sell equity securities of the target company," RSA 421-A:2 VI(a)(1) (Supp. 1979), applies to the block transactions executed on national security markets by the plaintiffs; and (2) whether the act, as applied to the block transactions of the plaintiffs, is constitutional under the Supremacy Clause and the Commerce Clause of the United States Constitution.

## I. *Facts and Opinion of the Commissioner*

The plaintiffs' principal brief states that "[t]he facts are straightforward and undisputed." It is not contested that the plaintiffs' acquisitions caused them to become "a record or beneficial owner of more than 5 percent of any class of the issued and outstanding equity securities" of Nashua, thus bringing their actions within the definition of "takeover bid" under the act unless covered by one of the statutory exclusions. RSA 421-A:2 VI (Supp. 1979). The plaintiffs, however, claim that their acquisitions do not constitute a takeover bid because they were effected by means of "[a]n offer by or through a broker-dealer in the ordinary course of his business *without solicitation of orders to sell* equity securities of the target company." RSA 421-A:2 VI(a)(1) (Supp. 1979). (Emphasis added.)

There was introduced in evidence a Schedule 13D under the Securities Exchange Act of 1934 (15 U.S.C. § 78m(a)(1) (1976)) filed by the plaintiffs with the Securities and Exchange Commission and dated November 15, 1979. This showed that plaintiff Summit owned at that time 301,900 shares of Nashua stock, which was five percent or more of Nashua's shares outstanding. It was stated therein that "Sharon and Summit periodically will review Summit's investment and may at any time determine to increase or decrease it, depending upon various factors including but not

limited to, the price of securities of Nashua and terms and conditions for their sale."

The *Wall Street Journal* carried an article reporting this Schedule 13D filing in its November 26, 1979 edition. There was also evidence of a press release on the matter at about that time. The cover letter with the copy of the Schedule 13D sent to Nashua stated that a copy of that schedule was being sent to each of the exchanges on which Nashua's common stock is listed. There was evidence of activity in Nashua stock in the late afternoon of November 27, 1979, and thereafter.

The plaintiffs acquired their eventual total of 476,100 shares of Nashua common stock in nine separate open market block transactions between October 11, 1979, and March 25, 1980. Brokers who were involved in eight of the nine purchases testified. There was evidence as to broker conduct in general, as well as to the specific conduct of the brokers involved in these transactions. There was also expert testimony on large block trading by "Aut-Ex," which provides interconnecting video terminals among several hundred clients interested in large block trading, and which was characterized by a witness as a "mechanical salesman." Such large block trading is also done by means of the daily "block list," which is updated every morning by brokerage houses. The list is distributed to all brokers in a firm and provides the basis for the brokerage houses showing both the buy and the sell side for the clients on a national hook-up.

There was also testimony of an understanding in the securities industry that once a customer makes an initial large purchase in the stock of a company, the brokerage house will, on behalf of that customer, solicit further stock in the company, unless the customer expressly instructs the brokerage house not to do so. The commissioner found that "[t]hese solicitation methods were clearly employed on behalf of Offeror [plaintiff] Posner."

On the evidence presented, the commissioner arrived at the following conclusion. The plaintiffs "engaged in a course of conduct which had as its natural and foreseeable consequence the solicitation of orders to sell Nashua common stock. Offerors [plaintiffs] cannot disclaim this solicitation. As persons familiar with the customs and practices of the securities industry, they knew or had reason to know that just such solicitation would take place." Consequently, the commissioner ruled that the plaintiffs were not entitled to the broker-dealer exemption under the act, RSA 421-A:2 VI(a)(1) (Supp. 1979), and were engaged in making a takeover bid within the meaning of the act. He further continued his cease-

and-desist order, thereby preventing the plaintiffs from purchasing or offering to purchase, or in any way acquiring or controlling, the stock of Nashua Corporation pending compliance with the "Security Takeover Disclosure Act," RSA 421-A:1 (Supp. 1979). The plaintiffs appealed the commissioner's order to the Superior Court (*Cann*, J.), who transferred without ruling the questions involved.

The plaintiffs state that whether the block trading practices they used in obtaining their stock in Nashua constitute solicitation is a question of first impression. Our act does not define solicitation, and apparently neither does any other business takeover act.

Defendant commissioner and intervenor Nashua maintain that the broker-dealer exemption claimed by the plaintiffs is designed to exclude from the act's definition of a takeover bid the ordinary anonymous open market transaction in which buy orders and sell orders meet independently without the sell order being solicited by the buyer. They maintain further that any solicitation destroys the anonymity of the auction market and puts added pressure on sellers. They also argue that the act does not attempt to distinguish between differing types or degrees of solicitation, but simply requires an "offeror" to comply with the act unless the acquisition of more than five percent of outstanding stock is accomplished "without solicitation of orders to sell. . . ." RSA 421-A:2 VI(a)(1) (Supp. 1979).

The commissioner in his opinion stated:

> "that the central purpose of the statute is to provide advance disclosure to shareholders of the circumstances of those buyers of shares who may be acquiring control of the company. . . . Two considerations of fairness underlie this ethical premise: First, that the selling price of shares that carry control will normally reflect a premium for such control; and, second, that a shareholder before he decides to sell the element of control is entitled to disclosure as to who the new controlling authority will be."

No such considerations of fairness apply if the sell order is unsolicited because the buyer has purchased only stock which has come to market without his solicitation—hence, the exemption under RSA 421-A:2 VI(a)(1) (Supp. 1979).

■ ■ The plaintiffs maintain, on the other hand, that their method of acquiring Nashua stock solely by open market purchases does not constitute a takeover bid even if it is aimed at

acquiring control of a target company. *See Matter of City Investing Co.*, 411 N.E.2d 420, 429 (Ind. App. 1980). Depending on the accompanying circumstances, however, open market purchases can be considered as having the essentials of a takeover bid. *See UV Industries, Inc. v. Posner*, 466 F. Supp. 1251, 1258 (D. Me. 1979); *Sheffield v. Consolidated Foods Corp.*, 276 S.E.2d 422, 437, 441–42 (N.C. 1981).

The fact, among others, that there was evidence that the plaintiffs could have expressly instructed their brokers that there should be no solicitation constitutes a weighty accompanying circumstance. Such an instruction would have prevented the use of "Aut-Ex" and daily "block lists" by the broker-dealers to publicize the extent of large block interest in Nashua stock and thereby to solicit sell orders. We hold that the record supports the commissioner's decision on this issue of the case, namely, that the plaintiffs do not come within RSA 421-A:2 VI(a)(1) (Supp. 1979), which would exclude them from being involved in a takeover bid under our act, and that the act, therefore, applies to their transactions. *See UV Industries, Inc. v. Sharon Steel Corp.*, 466 F. Supp. at 1258. *See also Calumet Industries, Inc. v. MacClure*, 464 F. Supp. 19, 32 (N.D. Ill. 1978) (definition of "solicitation" in conjunction with proxies).

II. *Preemption Under the Supremacy Clause*

Article VI of the Federal Constitution provides in part as follows: "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

■ Our first inquiry is whether Congress has prohibited State regulation of the field in question either by explicit statement in the federal statute or by implication in its structure and purpose. *See City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 633 (1973). There is no express language of preemption in the applicable provisions of the Securities Exchange Act of 1934 (SEA). *See* 15 U.S.C. §§ 78m(d)–(e), n(d)–(f) (hereinafter the Williams Act). Nor is the statutory scheme so pervasive that an implicit congressional intent to preempt parallel State legislation may fairly be inferred. *See Pennsylvania v. Nelson*, 350 U.S. 497, 504 (1956). On the contrary, section 28(b) of SEA (15 U.S.C. § 78bb(a)) provides that "[n]othing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like

functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." "This section was plainly intended to protect, rather than to limit, state authority." *Leroy v. Great Western United Corp.*, 443 U.S. 173, 182 (1979). Historically, state regulation has played a coordinate role in the securities field. *See Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 137 (1973).

■ Even though there may be no congressional enactments that explicitly or implicitly exclude all State legislation in the same field, federal statutes nevertheless override any state laws with which they conflict. *Appeal of New England Power Co.*, 120 N.H. 866, 871, 424 A.2d 807, 811 (1980). The test is whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Florida Avocado Growers v. Paul*, 373 U.S. 132, 141 (1963) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). This determination requires us to consider "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

The Williams Act was designed to close the gap in the disclosure requirements of the federal securities laws by bringing cash tender offers, which previously had been virtually unregulated, within the ambit of those laws. *Mite Corp. v. Dixon*, 633 F.2d 486, 492 (7th Cir. 1980). The dominant theme of that act is the "protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 35 (1977). This is accomplished by requiring the disclosure of pertinent information to the stockholders when a person seeks to obtain control of a corporation. The principal disclosure provisions of the Williams Act are sections 13(d) (15 U.S.C. § 78m(d)) and 14(d) (15 U.S.C. § 78n(d)). Section 13(d) requires that a purchaser of any equity security registered pursuant to the SEA file a Schedule 13D with the Securities and Exchange Commission (SEC) within ten days after its ownership exceeds five percent of the outstanding shares of the security. Section 14(d) "is designed to insure informed shareholder decision-making in the face of a *tender offer* by requiring that a *tender offeror* file a Schedule 14D-1 with the SEC and furnish to the target's shareholders all material information which it contains." *Mite Corp. v. Dixon*, 633 F.2d at 492–93. (Emphasis added.)

■ The first alleged conflict is between 15 U.S.C. § 78n(d)(1) and RSA 421-A:3 (Supp. 1979). The State statute provides that "[n]o offeror shall make a takeover bid unless at least 20 days prior

thereto he files with the commissioner and the target company a registration statement containing the information required by RSA 421-A:4 [Supp. 1979] and publicly discloses the material terms of the offer." The federal statute, on the other hand, requires disclosure of the information specified in 15 U.S.C. § 78m(d) at the time a *tender offer* is made.

The commissioner properly answered this contention in his opinion:

"The simple answer to Offeror's argument is that they are not conducting a tender offer and are under no . . . obligations [under 15 U.S.C. § 78n(d)(1)]. Thus as to their immediate conduct, no conflicting obligations are imposed by state and federal law. Indeed the absence of a conflict is evident from the fact that Offerors have made no filing under Rule 14d-2(b) [17 C.F.R. 240 14d-2(b)]. I need not consider in this case the argument that a conflict would be presented were Offerors proceeding via a tender offer."

*See Esmark, Inc. v. Strode*, No. 80-CA-1210-MR, slip op. at 5 (Ky. April 3, 1981).

The term "tender offer" has been defined as follows:

"A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price. Cash or other securities may be offered to the shareholders as consideration; in either case, the consideration specified usually represents a premium over the current market price of the securities sought. This opportunity to tender shares at a premium remains open for only a limited period of time, often about two weeks."

*Matter of City Investing Co.*, 411 N.E.2d 420, 427 (Ind. App. 1980) (quoting Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 HARV. L. REV. 1250, 1251–52 (1973)). Based on this definition, we agree with the commissioner that there is no tender offer involved in this case.

The commissioner also properly ruled that there is no genuine conflict between the requirements of RSA 421-A:3 (Supp. 1979) and 15 U.S.C. § 78m(d)(1) (Supp. 1980), which requires a public disclosure to be made ten days after the stock is acquired. The plaintiffs did not prove that it is physically impossible to meet both requirements. Furthermore, the defendants claim that the plaintiffs have conceded that they are "technically" able to comply

with both requirements. There is no preemption merely because the State and Federal Acts contain different provisions. *See Florida Avocado Growers v. Paul*, 373 U.S. at 142–43.

■ We also sustain the commissioner's ruling that RSA 421-A:7 (Supp. 1979) does not conflict with stock exchange rules governing the type of open market transactions with which we are dealing in this case. RSA 421-A:7 (Supp. 1979) is entitled "Tender and Withdrawal of Shares." It deals with proration of shares which have been *tendered* or *deposited* pursuant to a takeover offer. It also deals with the withdrawal of those shares, and its "best price" regulation requires that if there has been an increase in the price offered for shares before the expiration of the tender date, all the shareholders must receive the increased consideration.

RSA 421-A:2 VI (Supp. 1979) defines a takeover bid broadly enough to include all methods of acquisition, ranging from so-called open market transactions to formal "tender offers" addressed to shareholders. It is evident by its provisions, however, that section 7 of our act was not intended to apply to a takeover bid by open market transactions as is the case in this appeal. The legislative history of the Williams Act shows that it too "was passed with full awareness of the difference between tender offers and other forms of large scale stock accumulations." *Brascan Ltd. v. Edper Equities Ltd.*, 477 F. Supp. 773, 790 (S.D.N.Y. 1979).

■■ We have considered the history of the Securities Exchange Act of 1934 and especially section 28(a), 15 U.S.C. § 78bb(a), which explicitly recognizes the role of the states in regulating securities transactions. We also note that the Williams Act has never expressly indicated an intent to preempt the securities field. The evidence of alleged conflicts between the provisions of the Williams Act and our Security Takeover Disclosure Act has failed to show an actual and significant frustration of federal purposes. *Kargman v. Sullivan*, 552 F.2d 2, 13 (1st Cir. 1977); *see Goldstein v. California*, 412 U.S. 546, 553 (1973).

Our act became effective March 25, 1977. It has not yet undergone significant shaping at the hands of the commissioner, to whom its administration has been delegated by the legislature. Nor is its language so unambiguous and inflexible as to leave no leeway for interpretation by the commissioner. His administrative interpretation is therefore entitled to deference. *N.H. Dept. of Rev. Administration v. Public Emp. Lab. Rel. Bd.*, 117 N.H. 976, 977–78, 380 A.2d 1085, 1086 (1977).

The United States Supreme Court will generally sanction State

regulation that supplements federal efforts so long as compliance with the State law is not likely to significantly impede the purposes of the federal law. L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-24 at 379 (1978). An examination of the provisions of our Security Takeover Disclosure Act reveals that, like the Williams Act, it is concerned with the protection of shareholders. The plaintiffs have failed to show that our act would produce in this case a direct and serious conflict with the clearly delineated federal purposes. We therefore hold that the commissioner properly ruled that our act is not preempted by the Williams Act.

III. *The Commerce Clause*

The test to determine the validity of a State statute under the commerce clause is as follows:

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*A & P Tea Co. v. Cottrell*, 424 U.S. 366, 371–72 (1976) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)) (citations omitted); *Metropolitan Life Ins. Co. v. Whaland*, 119 N.H. 894, 904, 410 A.2d 635, 641 (1979).

RSA 421-A:3 (Supp. 1979) provides that no offeror shall make a takeover bid unless at least twenty days prior thereto he files a registration statement with the commissioner and the target company and publicly discloses the material terms of his offer.

The plaintiffs and amicus curiae argue that this twenty-day hiatus would disrupt the nation's securities markets by influencing price levels and discouraging trading and that this would be completely incompatible with long-established patterns of institutional trading. They also contend that protection of shareholders could be accomplished in another way. Furthermore, they maintain that the defendants have completely failed to justify the statute both in terms of local benefits flowing from it and the unavailability of non-discriminatory alternatives adequate to protect the local interests at stake.

■ The commissioner pointed out in his opinion that under RSA 421-A:2 VI(a)(4) (Supp. 1979) any offeror may seek to be excused from registration if his offer is "not being made for the purpose of, and not having the effect of, changing or influencing the control of the issuer. . . ." In that situation the commissioner may exempt the offeror from the definition of a "takeover bid." The burden of showing discrimination against commerce rests on the party challenging the validity of the statute, and if that burden is met, then the State must justify the constitutionality of the act. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

■ The defendants maintain that the act regulates evenhandedly since all offerors are treated alike. *See AMCA Intern. Corp. v. Krouse*, 482 F. Supp. 929, 938 (S.D. Ohio 1979). The act neither favors local investors nor insulates local citizens or business from interstate commerce. There is substantial evidence that the various state takeover statutes have not interfered with interstate commerce or worked to preclude an open market approach to takeover bids. Nor have these statutes deterred offerors from making tender offers or prevented target companies from being acquired. *Esmark, Inc. v. Strode*, No. 80-CA-121-MR, slip op. at 9–10 (Ky. April 3, 1981). That is especially true on the facts of this case.

The State of New Hampshire has a legitimate local interest in regulating takeover attempts involving a possible change of control of companies headquartered in this State who likely would have a disproportionately large percentage of stockholders located here. *See AMCA Intern. Corp. v. Krouse, supra* at 939. The Federal Constitution merely requires that the burdens on interstate commerce not be excessive. Note, *The Constitutionality of State Takeover Statutes: A Response to Great Western*, 53 N.Y.U. L. REV. 872, 939 (1978). Furthermore, State regulations in this field which are "aimed at . . . fraudulent or otherwise unfair trade practices . . . are less likely to be perceived as 'undue burdens on interstate commerce. . . .' " L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-12 (1978).

We hold that the plaintiffs have failed to sustain their burden of proving that RSA ch. 421-A (Supp. 1979) imposes a burden upon interstate commerce that is "clearly excessive in relation to the putative local benefits." *See Pike v. Bruce Church, Inc.*, 397 U.S. at 142; *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980).

*Remanded.*

DOUGLAS, BROCK and KING, JJ., did not sit; LAMPRON, C.J., retired supreme court justice, and GOODE and DiCLERICO, JJ.,

superior court justices, sat by special assignment under RSA 490:3; all concurred.