Grafton
No. 98-560

ANDREW S. KAPLAN *& a.*

v.

BOOTH CREEK SKI GROUP, INC. *& a.*

November 20, 2001

*Orr & Reno, P.A.*, of Concord (*Bradford W. Kuster* on the brief), and *L'Abbate, Balkan, Colavita & Contini, L.L.P.*, of Garden City, New York (*Noah Nunberg* orally), for the plaintiffs.

*Sheehan, Phinney, Bass + Green, P.A.*, of Manchester (*Michael C. Harvell & a.* on the brief, and *Mr. Harvell* orally), for the defendants.

DUGGAN, J. The plaintiffs, Andrew S. Kaplan and James F. Miles, shareholders of Loon Mountain Recreation Corporation, Inc., (Loon), sought to prevent the acquisition of Loon by the defendants, Booth Creek Ski Group (Booth Creek) and its subsidiary, LMRC Acquisition Corporation, until the defendants complied with the requirements of RSA chapter 421-A (1987), the Security Takeover Disclosure Act (Takeover Act). The plaintiffs appeal from an order of the Superior Court (*Lynn,* J.) dismissing their equity action on the basis that the Takeover Act does not apply to the merger between Loon and Booth Creek. We affirm.

In September 1997, the board of directors of Loon, which owns and operates Loon Mountain ski resort, reached a merger agreement with the board of directors of Booth Creek, a Delaware corporation, allowing Booth Creek to acquire all of Loon's stock. Under the merger agreement, after Booth Creek acquired all of Loon's shares, a subsidiary of Booth Creek would merge with Loon, making Loon the surviving corporation and a wholly-owned subsidiary of Booth Creek. During negotiations, Booth Creek requested that Loon obtain and deliver to Booth Creek shareholder agreements from the holders of a majority of the Loon shares promising to vote in favor of the merger. On the same day the merger agreement was executed, Booth Creek entered into shareholder agreements with sixteen Loon shareholders holding 57.3% of the outstanding common stock. The terms of each shareholder agreement required that the shareholder grant his or her irrevocable proxy to Booth Creek to approve the acquisition by Booth Creek of Loon pursuant to the terms of the merger agreement.

On September 25, 1997, Booth Creek asked the New Hampshire Bureau of Securities Regulation (Bureau) to issue a "no-action" ruling with respect to the application of RSA chapter 421-A to Booth Creek's purchase of Loon. On October 6, 1997, finding that the transaction between Booth Creek and Loon constituted a non-hostile takeover, the Bureau ruled that RSA chapter 421-A did not apply and issued a no-action order. As a result, Booth Creek did not prepare a registration statement as required by RSA 421-A:3.

Soon thereafter, Loon provided the plaintiffs and other shareholders of Loon common stock with a copy of a Loon proxy solicitation statement for the annual shareholders' meeting, at which the shareholders would be asked to vote on the merger agreement. The proxy statement did not include a copy of the complete merger agreement between Booth Creek and Loon. It also did not provide any information regarding Booth Creek's officers and directors.

On October 14, 1997, the plaintiffs requested the Bureau to reconsider its no-action order. Before the Bureau responded, the plaintiffs filed actions in superior court. The Bureau subsequently denied the plaintiffs' request for reconsideration.

The parties were unable to close the transaction by the originally established November 30, 1997 deadline, so Booth Creek and Loon executed an amendment to the merger agreement. Although the terms of the amended agreement deviated from the original agreement, the Bureau issued an order finding that the amended provisions did not substantively deviate from the original agreement and therefore the no-action order remained applicable to the amended transaction. The merger transaction ultimately closed on February 26, 1998.

The plaintiffs instituted consolidated actions for declaratory and injunctive relief, pursuant to RSA chapter 421-A, seeking to prevent the acquisition of Loon by Booth Creek until the defendants complied with the requirements of the Takeover Act. The superior court initially denied the defendants' motion to dismiss, holding that the Takeover Act was applicable to all takeovers, whether hostile or consensual. Upon reconsideration, the superior court reversed itself, ruling that the Takeover Act did not apply. The court explained that although it is theoretically possible to find that the shares acquired by Booth Creek indirectly stemmed from a takeover bid by Booth Creek, this result would require a strained reading of the Takeover Act far removed from its central purpose as revealed by its legislative history. The plaintiffs appeal, arguing that the trial court erred by: (1) holding that RSA chapter 421-A does not encompass statutory mergers; and (2) granting the motion to dismiss based on incorrect factual allegations.

The interpretation of a statute is ultimately a question of law for this court. *See Gaucher v. Cold Springs RV Corp.*, 142 N.H. 299, 301 (1997). In any statutory interpretation case, we determine the legislature's intent by turning first to the language in the statute itself. *See Silva v. Botsch*, 120 N.H. 600, 601 (1980). In conducting our analysis, "we will focus on the statute as a whole, not on isolated words or phrases." *Snow v. American Morgan Horse Assoc.*, 141 N.H. 467, 471 (1996). Although we "will not look beyond the language of a statute to determine legislative intent if the

statute's language is clear and unambiguous," *State v. Rothe*, 142 N.H. 483, 485 (1997), "[w]here the statutory language is ambiguous or where more than one reasonable interpretation exists, we review legislative history to aid in our analysis." *K & J Assoc. v. City of Lebanon*, 142 N.H. 331, 333 (1997).

The Takeover Act requires entities making takeover bids to file with the secretary of state and the target company a registration statement containing information such as the offeror's identity, the extent of its financial assets, and its long term plans upon gaining control of the target company. *See* RSA 421-A:3, :4 (1998). The Takeover Act defines a "takeover bid" as:

> The acquisition of, offer to acquire, or request or invitation for tenders of an equity security of a corporation organized under the laws of this state . . . , if after acquisition thereof the offeror would, directly or indirectly, be a record or beneficial owner of more than 5 percent of any class of the issued and outstanding equity securities of such corporation.

RSA 421-A:2, VI. The Takeover Act defines an "offeror" as "a person who makes, or in any way participates or aids in making a takeover bid." RSA 421-A:2, IV. The plaintiffs assert that the transaction between Loon and Booth Creek falls within the statutory definition of "takeover bid" because Booth Creek accomplished its acquisition of Loon by offering to acquire or requesting the tenders of the equity securities of Loon, thereby becoming the beneficial owner of one hundred percent of the equity securities of Loon. The plaintiffs further argue that the Takeover Act was intended to encompass all acquisitions, including statutory mergers under RSA 293-A:11.01-09 (1999). The plaintiffs' interpretation, however, is overbroad and contrary to the purpose of the Takeover Act.

■ The definition of a "takeover bid" covers three situations: (1) acquisitions of an equity security; (2) offers to acquire an equity security; and (3) requests or invitations for tenders of an equity security. *See* RSA 421-A:2, VI. The Takeover Act on its face is ambiguous as to whether the legislature intended the "acquisition of, offer to acquire, or request or invitation for tenders of an equity security" to include statutory mergers. Consequently, we must determine the intent of the legislature in enacting RSA chapter 421-A. *See Larose v. Superintendent, Hillsborough County Correction Admin.*, 142 N.H. 364, 366 (1997). A review of the legislative history, purpose, and various provisions of the Takeover Act makes clear that the Takeover Act was not intended to include statutory mergers.

Prior to the 1960's, tender offers were largely unregulated by both the federal and State government. *See* 13 Z. CAVITCH, BUSINESS ORGANIZATIONS § 166A.01 (2000). In 1968, the federal government began regulating tender offers under the Williams Act, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f) (1994 & Supp. V 1999), which requires disclosure of important information by anyone seeking to acquire more than five percent of a company's securities by direct purchase or tender offer. *See Sheffield v. Consolidated Foods Corp.*, 276 S.E.2d 422, 427-28 (N.C. 1981). The New Hampshire Takeover Act was enacted in an effort to remedy perceived inadequacies in the Williams Act. *See* N.H.S. JOUR. 455-58 (1977). Because the Williams Act as originally enacted allowed tender offers to proceed for ten days prior to the filing of information about the tender offeror and its offer, the Takeover Act was passed in an attempt to correct this potential loophole. *See id.*

Although neither the Williams Act nor the Takeover Act defines a tender offer, it has been conventionally defined as:

> [A] publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price. Cash or other securities may be offered to the shareholders as consideration; in either case, the consideration specified usually represents a premium over the current market price of the securities sought. This opportunity to tender shares at a premium remains open for only a limited period of time, often about two weeks.

*Sharon Steel Corp. v. Whaland*, 121 N.H. 607, 615 (1981), *vacated and remanded on other grounds*, 458 U.S. 1101 (1982), *rev'd on other grounds*, 124 N.H. 1 (1983). Due to their simplicity, cash for stock tender offers are a popular tactic in corporate takeovers because if a majority of the shareholders "tender" their shares, the acquiring company can take control of the target company over the opposition of the target company's management or board. *See* CAVITCH, *supra* § 166A.01. Both the Williams Act and the Takeover Act ensure that shareholders faced with a tender offer are provided with information regarding the quality and intentions of the offeror, and that the target company's management is provided an opportunity to express and explain its position. *See Matter of City Investing Co.*, 411 N.E.2d 420, 428-29 (Ind. Ct. App. 1980).

█ Unlike a tender offer in which shareholders are requested to tender their shares directly to the acquiring entity, in a statutory merger the board of directors of each corporation must adopt a plan of merger. *See* RSA 293-A:11.01. After adopting a plan of merger, the board of directors

generally must submit the plan of merger for approval by its shareholders. *See* RSA 293-A:11.03. When a merger takes effect, the shares of each corporation party to the merger are converted into the right to receive the consideration specified in the plan of merger. *See* RSA 293-A:11.06. To apply the Takeover Act to statutory mergers would not further the Takeover Act's purpose of protecting shareholders faced with a tender offer because in a statutory merger the acquiring company is not requesting tenders of equity, but rather is engaged in negotiations with the board of directors in order to create a plan of merger. Thus, unlike tender offers, in a merger transaction there is no direct solicitation of shareholders.

Furthermore, in a merger transaction the board of directors has a fiduciary duty to its shareholders to provide information regarding the merger and to ensure that it obtains the best transaction reasonably available to the shareholders. *See Zirn v. VLI Corp.*, 621 A.2d 773, 778 (Del. 1993). In the event that the board of directors fails to live up to this responsibility, it may be held liable for breach of its duty. *See Rosenblum v. Company*, 99 N.H. 267, 271 (1954). Because the board of directors is already required to supply shareholders with all material information relevant to their decision and has a duty to ensure that it obtains the best transaction available, applying the Takeover Act to statutory merger transactions would not further the Takeover Act's central purpose of protecting shareholders.

■ Two provisions of the Takeover Act also make it apparent that the legislature did not intend to include statutory mergers within its ambit. First, RSA 421-A:4, IV requires an entity making a takeover bid to include in its registration statement

> [a] statement of any plans or proposals which the offeror, *upon gaining control*, may have to liquidate the target company, sell its assets, *effect a merger or consolidation of it*, or make any other major change in its business, corporate structure, management personnel, or policies of employment.

(Emphasis added.) This language strongly suggests that the Takeover Act was not intended to apply to statutory mergers because the legislature did not consider a merger to be one of the means of gaining control. Second, the Takeover Act explains that the definition of a "takeover bid" does not include "[a]n offer to acquire such equity security solely in exchange for other securities." RSA 421-A:2, VI(a)(2). The exclusion of stock for stock transactions illustrates that the legislature was mainly concerned with offers made directly to shareholders to purchase their equity security for

cash, not share exchanges. Furthermore, a review of the legislative history reveals that upon introducing the bill that would ultimately become the Takeover Act, Senator Trowbridge explained the rationale behind this distinction. He noted the need for the Takeover Act because "[i]nstead of trying to merge or acquire by exchange of shares, [the offerors] simply get a lot of money collected from the investment banking world and within a ten-day period go and make a raid on a usually smaller but profitable corporation." N.H.S. JOUR. 456 (1977) (emphasis added).

The plaintiffs argue that if the legislature wished to exclude merger transactions such as the one between Booth Creek and Loon, it could have easily placed such an exclusion in the statute. In support of this argument, the plaintiffs point to the Massachusetts Takeover Statute, which states that a "takeover bid" does not include "[a]ny take-over bid to which the target company consents, by action of its board of directors, if such board of directors has recommended acceptance thereof to shareholders and the terms thereof." Mass. Ann. Laws ch. 110C, §1 (1997). The plaintiffs contend that if the legislature intended to exclude board approved takeovers, it would have included a similar provision. This exception, however, excludes only tender offers and other direct share purchases that are consented to by the target company board, not merger transactions. The existence of such a provision would support only the contention that consensual takeovers are excluded from the Takeover Act and the absence of such a provision in our own statute does not affect our conclusion that merger transactions are not encompassed. In fact, in 1977, when the New Hampshire Takeover Act was originally adopted, it contained a provision exempting consensual takeovers. Former RSA 421-A:2, VI(a)(6)(1977) stated that a "takeover bid" did not include "[a]ny tender offer or request or invitation for tenders to which the target company consents, by action of its board of directors, if such board of directors has recommended acceptance thereof to shareholders and the terms thereof." In 1983, this provision was repealed. See Laws 1983, 144:2. This repeal does not suggest that statutory merger transactions are also included in the Takeover Act.

Finally, the plaintiffs argue that even if we determine that the Takeover Act does not encompass statutory mergers, the solicitation of shareholder agreements from Loon shareholders would be covered by the Takeover Act. It is unnecessary to determine whether the Takeover Act encompasses these shareholder agreements because the Takeover Act excludes from the disclosure requirements the acquisition of an equity security from not more than twenty-five persons. See RSA 421-A:2, VI(a)(3). Here, Booth Creek only solicited shareholder agreements from sixteen shareholders.

Next, the plaintiffs argue that the superior court erred in granting the motion to dismiss by failing to assume the truth of the facts alleged by the plaintiffs in their petition and by relying on findings of fact contrary to the plaintiffs' allegations. "In determining whether a motion to dismiss should be granted, all facts properly pleaded are assumed to be true, and the reasonable inferences therefrom are construed most favorably to the plaintiff." *Proctor v. Bank of N.H.*, 123 N.H. 395, 398 (1983). The plaintiffs contend that the superior court relied on two factual allegations by Booth Creek which the record shows are incorrect.

First, the plaintiffs contend that the superior court erred in its conclusion that the solicitation of Loon shareholders was carried out by Loon rather than Booth Creek. Because Booth Creek directly contracted with sixteen shareholders holding a majority of the shares of Loon, the plaintiffs contend that these contractual relationships constitute substantial direct dealings between Booth Creek and the individual shareholders of Loon. As previously discussed, however, we need not determine whether the solicitation of shareholder agreements constitutes a "takeover bid" under the Takeover Act because the Takeover Act excludes from the disclosure requirements the acquisition of an equity security from not more than twenty-five persons. *See* RSA 421-A:2, VI(a)(3). Thus, whether Loon or Booth Creek carried out the solicitation of shareholder agreements is inconsequential.

Second, the plaintiffs assert that the superior court erred in determining that the shareholders were not presented with a choice of whether or not to sell their shares in the merger transaction. Although in reviewing a motion to dismiss on appeal we accept as true the plaintiff's allegations of fact, we need not accept allegations that are merely conclusions of law. *See Gardner v. City of Concord*, 137 N.H. 253, 255-56 (1993). Here, it is undisputed that in this merger transaction the shareholders were faced with the choice of whether to approve the merger and receive the cash payment from Booth Creek, or to dissent and exercise their appraisal rights pursuant to RSA 293-A:13-:31. The superior court determined that as a matter of law, the shareholders were not left with the choice to sell their shares because once the merger transaction was approved by a majority of the shareholders, any dissenting shareholders only had their statutory rights under RSA 293-A:10.01 through 13.31. In making this determination, the superior court did not rely on factual allegations; therefore, it did not err in granting the motion to dismiss based on incorrect factual allegations.

*Affirmed.*

GROFF, O'NEILL and ARNOLD, JJ., superior court justices, specially assigned under RSA 490:3, concurred.